**Marion Albert PRUETT, Petitioner,**

v.

**Larry NORRIS, Director Arkansas Department of Correction, Respondent.**

**Civil No. PB–C–88–195.**

United States District Court, E.D. Arkansas, Pine Bluff Division.

March 24, 1997.

Rosalie B. Shields, New York City, Thomas M. Lahiff, Jr., New York City, Timothy O. Dudley, Little Rock, AR, for Petitioner.

Pamela Rumpz, Darnisa C. Evans-Johnson, Arkansas Attorney General's Office, Little Rock, AR, for Respondent.

*MEMORANDUM OPINION
AND ORDER*

GEORGE HOWARD, Jr., District Judge.

On September 9, 1982, a jury found Marion Albert Pruett ("Pruett") guilty of capital murder of Bobbie Robertson, and sentenced him to death by electrocution. Pruett appealed his sentence to the Arkansas Supreme Court, raising twenty-one separate points. The Arkansas Supreme Court affirmed the conviction and sentence in *Pruett v. State,* 282 Ark. 304, 669 S.W.2d 186 (1984). The United States Supreme Court denied the petition for writ of certiorari on October 29, 1984. *Pruett v. Arkansas,* 469 U.S. 963, 105 S.Ct. 362, 83 L.Ed.2d 298 (1984).

Pruett sought post-conviction relief pursuant to Rule 37 of the Arkansas Rules of Criminal Procedure. The petition was denied in *Pruett v. State,* 287 Ark. 124, 697 S.W.2d 872 (1985).

Pruett then filed an application in the alternative for a writ pursuant to the All Writs Statute or for a Writ of Habeas Corpus, contending that his extradition from Mississippi to Arkansas violated his constitutional rights and seeking an order vacating a proclamation by the Governor of Arkansas setting an execution date for Pruett of April 7, 1988. On application of Pruett, the Court entered an Order staying the execution.

Pruett subsequently amended his petition for writ of habeas corpus to assert constitutional challenges to his conviction and sentence in Arkansas.[1]

## I. Facts

On October 12, 1981, the Convenience Corner in Fort Smith, Arkansas, was robbed. Bobbie Jean Robertson, an employee of the store, was abducted and fatally shot. On October 17, 1981, Pruett was arrested for unrelated offenses in Texas. He was subsequently taken as a federal prisoner to Mississippi where he stood trial in state court for the murder of a bank teller and received the death penalty. While in custody in Mississippi, Pruett held a press conference in which he implicated himself in several crimes and

---

1. Pruett filed an amended petition on September 28, 1990. He requested and was granted leave to file a second amended petition on December 17, 1990.

referred to himself as "mad dog killer." In addition, while in custody in Mississippi, Pruett made an inculpatory statement relevant to the instant case to Detective Larry Hammond of the Fort Smith Police Department.

Pruett was charged by Information on June 14, 1982, with capital murder, and entered a plea of not guilty. Trial began on August 30, 1982.

## II. Grounds for Relief

Pruett has raised sixteen grounds for relief. In addition, Pruett challenges the constitutionality of his extradition from Mississippi. The Court will discuss each of the grounds raised by Pruett in the order he has presented them in his second amended petition.[2]

### A. *Mental Competency of Juror*

■ Pruett alleges that juror Richard Earl Allured was mentally incompetent at the time he served on the jury. The State contends that this claim is procedurally defaulted because Pruett did not properly raise it in state court.

Pruett raised this ground in his Rule 37 petition. The Arkansas Supreme Court stated:

Since the issue of Allured's mental competence in 1982 could have been questioned at trial or in a motion for new trial, petitioner has the additional burden of showing that Allured's presence on the jury resulted in a deprivation of some constitutional right so fundamental as to void judgment of conviction....

Even in cases where counsel filed a timely motion for new trial, a post-verdict allegation of juror incompetence will not result in setting aside the judgment unless the defendant produces substantial evidence of incompetence *at the time of trial,* such as

an adjudication of insanity made shortly before or after the trial.

*Pruett v. State,* 287 Ark. 124, 130, 697 S.W.2d 872 (1985).

In its Order of July 14, 1993, the Court found this claim not to be barred, and that the Court could address it. Pruett's claim, however, is foreclosed by the ruling in *Tanner v. United States,* 483 U.S. 107, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987). There, the Supreme Court found that testimony concerning the juror's mental or physical incompetence is an "internal matter" which is prohibited by Rule 606(b) of the Federal Rules of Evidence.

■ Furthermore, even assuming that "Rule 606(b) is interpreted to retain the common-law exception allowing postverdict inquiry of juror incompetence in cases of 'substantial if not wholly conclusive evidence of incompetency,'" Pruett has failed to make such a showing. *Tanner,* 483 U.S. at 125, 107 S.Ct. at 2750. The evidence submitted reflects, at the most, that almost two years after the trial, Allured was admitted to the hospital for psychiatric problems. According to medical records introduced at the evidentiary hearing, Allured was diagnosed on June 18, 1984, at St. Edward Mercy Medical Center with acute paranoid disorder and passive dependent personality traits. (E.H. Exhibit 3).[3] Prior to his commitment in 1984, Allured did not have a previous documented history of psychiatric problems and treatment. According to Allured's employment records at the time of trial, Allured was gainfully employed and even working overtime. (E.H.162–166).

In sum, there is no evidence to support a conclusion that Allured was incompetent at the time of the trial.

### B. *Denial of Fair Trial Due to Community Prejudice*

Pruett contends that because of the pretrial media coverage in his case he should have been granted a second change of venue.

**2.** Pruett's claim that the use of a death-qualified jury is unconstitutional is foreclosed by *Lockhart v. McCree,* 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986) and need not be addressed further. *See Hatley v. Lockhart,* 990 F.2d 1070, 1072 (1993).

**3.** References to the record of the evidentiary hearing, held on December 5–8, 1994, are designated as E.H. References to the record of the state court proceedings, contained in ten volumes, are designated as Tr.

Before addressing the evidence regarding the change of venue issue in this action, the Court would call to mind the concept that has been the cornerstone of this nation's system of justice that mandates that all persons accused of crimes are entitled to a fair trial, the innocent as well as the not so innocent. The concept was well expressed in an early case rendered by a state court in *Tennison v. State,* 79 Miss. 708, 31 So. 421 (1902):

> "It is one of the crowning glories of our law that no matter how guilty one may be, no matter how atrocious his crime, nor how certain his doom, when brought to trial anywhere he shall, nevertheless, have the same fair and impartial trial accorded to the most innocent defendant. Those safeguards, crystallized into the constitution and laws of the land as the result of the wisdom of centuries of experience, must be, by the courts, sacredly upheld, as well in case of the guiltiest as of the most innocent defendant answering at the bar of his country."

■■■ A change of venue, in substance as opposed to form, is one mode that our justice system affords an accused for vindication of this right. Recognizing that the change of venue decision is committed to the trial judge's sound discretion, not his unfettered discretion, the trial judge has an obligation to require more than simply the mere selection of twelve jurors who may survive a challenge for cause. In order to meet this obligation objectively and guard against not only the slightest taint or indication of bias or unfairness, but even against the appearance of unfairness, the trial judge must be informed by evidence during the venue hearing of the impact of the saturation media publicity upon the attitudes of the relevant community. Indeed, if an unbiased jury is not impaneled, it does not matter how fair the remainder of the proceeding may be. More importantly, whatever interest the State of Arkansas may have in proceeding in the county where the offense was committed or the initial transfer of a proceeding, it is, indeed, subordinate to the vested right of an accused to an impartial jury.[4]

In *Cockrell v. Dobbs,* 238 Ark. 348, 381 S.W.2d 756 (1964), the Arkansas Supreme Court further emphasized the State's subordinate interest in determining where a criminal proceeding is to be conducted, when a defendant's right to a fair and impartial trial is in jeopardy, by ordering the trial judge to conduct a hearing on defendant's motion for a change of venue where the trial judge denied defendant's request for a hearing on the grounds that he could not grant any relief even if the motion had merit because Garland County was the only county in the Judicial District. The Supreme Court made the following significant observation in rejecting the trial court's narrow construction of Section 10 of Article 2 of the Arkansas Constitution:

> "We are nevertheless of the opinion that the court below construed the Bill of Rights much too narrowly, permitting its strict letter to defeat its manifest purpose. Changes of venue were recognized at common law. Without a doubt Section 10 of Article 2, authorizing a transfer to another county within the district, was meant to preserve the accused's right to a change of venue, not to deny that right. The important declaration in this section of the constitution is it guaranty of a trial by an impartial jury. A change of venue is means to that end. The subordinate directive that it be to another county in the district is also for the protection of the accused, for it prevents the trial from taking place at an unreasonable distance from the county where the offense was committed."

---

4. The Arkansas Supreme Court in recognizing the secondary and subordinate interest of the state in the locality of the prosecution of defendant when the defendant's right to a fair and impartial trial is implicated made the following observation in *Bailey v. State,* 204 Ark. 376, 381, 163 S.W.2d 141 (1942):

Indeed, a change of venue in a criminal prosecution must be deemed a wrong to the public

*unless the necessities of justice to the accused require it,* and before a court is justified in sustaining an application therefor on account of the prejudice of the inhabitants of the county, it must affirmatively appear that there is such a feeling of prejudice prevailing in the community as will be reasonably certain to prevent a fair and impartial trial.

" ... *But when a county becomes a district in itself it would defeat the plain purpose of Section 10 to hold that the circuit court is powerless to grant a change venue, even though it is shown that the defendant cannot hope to obtain a fair trial in the county. The heart of Section 10 is its guaranty of an impartial jury. Any interpretation that destroys that guaranty is wrong.*" [5]

As late as 1983, the Arkansas Supreme Court reaffirmed this guide or rule of law in making the following observation in the case of *Anderson v. State*, 278 Ark. 171, 644 S.W.2d 278 (1983), where defense counsel asked the trial court to remove the trial to a site beyond the judicial circuit which is composed of only two counties, Sebastian and Crawford, and the trial judge said he could not do that under the present law:

"If the question is whether a defendant can or cannot receive a fair trial, as required by the fourteenth amendment to the United States Constitution, *then conflicting law must give way to the defendant's right to due process.*"

In *Anderson,* the Arkansas Supreme Court further observed that "since Anderson received a life sentence instead of death, and was not convicted of capital murder, but instead only murder in the first degree, most of Anderson's arguments relating to the jury's prejudice lose their force."

The Supreme Court of the United States in recognizing the sacredness of every defendant's right to a fair trial made the following observation in reversing a death sentence in the case of *Sheppard v. Maxwell,* 384 U.S. 333, 362, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600 (1966):

" ... Due process requires that the accused receive a trial by an impartial jury free from outside influences. Given the pervasiveness of modern communications and the difficulty of effacing prejudicial publicity from the minds of the jurors, the trial courts must take strong measures to ensure that the balance is never weighed against the accused. And appellate tribunals have the duty to make an independent evaluation of the circumstances.... But where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity."

With these *"safeguards, crystallized into the constitution and laws of the land as the result of the wisdom of centuries of experience"* well in mind, the Court now turns to the relevant evidence in this voluminous record on the change of venue issue.

Prior to trial,[6] defense counsel filed a motion "for a change of venue and for all other relief to which he may be entitled."

The State did not oppose the request and in responding to Pruett's request for a change of venue, the prosecuting attorney made the following comment:

"Under Arkansas law, the venue change, if granted, would be in Crawford County.... I think we're all aware of appellate decisions on this matter and *close scrutiny that these types of cases receive on appellate level,* and rather than possibly having

---

5. Section 10 of Article 2 of the Constitution of Arkansas provides in material part as follows:
 In all criminal prosecutions the accused shall enjoy the right to a speedy and public trial by impartial jury of the county in which the crime shall have been committed; provided that the venue may be changed to any other county of the judicial district in which the indictment is found, upon application of the accused ....

6. Petitioner was arraigned on June 14, 1982, and defense counsel, the Public Defender, was appointed to represent Pruett as co-counsel on June 17, 1982. Prior to June 14, 1982, the Public Defender had never met Pruett. The Public Defender's office, at the time of the appointment, consisted to two attorneys and one secretary. In addition to the heavy workload that the Public Defender's office was handling in Municipal and Circuit Courts, at the time of the appointment, the Public Defender's office had undertaken "the preparation of the appeal in the Thomas Simmons murder case which appeal was of tremendous magnitude and numbing complexity due to the numerous issues and tremendous volume presented by the record."

The trial court set deadlines of August 3, 1982, for Motions; August 9, 1982 for hearings; and August 30, 1982 for trial. Public Defender moved for a continuance which was denied by the trial court. (Tr. 28).

an error occur that an appellate court would take action on in the future, at this time we see no prejudice to the State in moving this case to Crawford County and have no objections.... (Tr. 533)." (Emphasis added).[7]

Pruett asserts persuasively that the change did not provide sufficient relief, inasmuch as the distance between the place where the trial was originally set (Fort Smith) is only ten miles from Van Buren, where the trial was held. Pruett argues that the citizens of both cities obtain their news from the same sources, and, accordingly, the potential jurors in Van Buren were exposed to the same print and electronic media coverage. Accordingly, Pruett contends that because of the depth and degree of the media coverage of his case, the trial court should have granted a second change of venue.

This Court's major concern is the saturation and drenching media coverage given not only of the circumstances leading to the charges in this action against Pruett, but other alleged criminal conduct—received the death penalty in Mississippi and two life terms in Colorado—as well as a statement made by Pruett describing himself as a "mad-dog killer."

Dr. Steven Smith, a professor in the Department of Communication at the University of Arkansas, Fayetteville, Arkansas, and without objection, was qualified as an expert to testify as to the extent of the media coverage in Sebastian and Crawford counties as well as the similarity between the two counties regarding the coverage, testified:

"In terms of media markets or media coverage Crawford County and Sebastian County are identical—in terms of media markets." (E.R.123).

Dr. Smith testified further:

Q. Geographically, about how far apart are Van Buren and Fort Smith?

A. The width of the Arkansas River. Less than a mile.

. . . .

Q. And what did you find when you reviewed those newspapers?

A. I found a number of stories on the particular case, both at the time between October and November of 1981, as well as in August and September of 1982.

Q. About how many stories were there?

A. In the October 16th to the November 7th of 1981, there were 10 stories on Page A–1 relating to the particular situation. And there were a total of 16 stories at that period. And there were an additional seven stories between August 30 and September 7th of 1982, which were all Page A–1 stories.

Q. Were there any references to Mr. Pruett as a mad dog?

A. There were three references during the period of October 16th to November 7th of 1981 and two references between August 31st and September 7th of 1982.

Q. Was there a story printed on August 30, 1982?

A. Yes, there was.

Q. In the Southwest Times Record.

A. Yes. On Page A–1, the headline is: "Pruett Murder Trial to Open."

. . . .

Q. Were there any references to this being a crime spree?

A. That particular article mentioned that Mr. Pruett had received the death penalty in Mississippi and two life terms in Colorado. There were number of, at least on three different occasions in the earlier period between October 13th and November 7th, references to a crime spree, a long list of crimes and a myriad of charges.

7. The following observation was set forth in an affidavit by John Settle and attached to the initial petition as exhibit I:

12. ... [W]hen I first moved for a change of venue, I could not have anticipated that months after completion of petitioner's trial, the Arkansas Supreme Court would abandon almost 110 years precedent and indicate in dicta that the state constitution restricting changes of venue to another county in the same judicial district could be ignored....

Davis Woods, a reporter for a Fort Smith television station during the period before the trial of Pruett and during the trial, submitted an affidavit, regarding the print and electronic media coverage of Pruett and the crime with which he was charged, made the following observations:

2. The print and electronic media coverage Marion Pruett and his crimes in Arkansas and other jurisdictions was extensive. The tape of his confession and his description of himself as a "mad-dog killer" was played several times by virtually every television station in Ft. Smith. It became commonplace to talk about Pruett as a "self-confessed mad-dog killer."

3. Fort Smith is the primary source of news for both Fort Smith and Van Buren. People in both Crawford and Sebastian counties would have been exposed to virtually the same news coverage. (Affidavit of Davis Woods submitted as exhibit H with initial petition.)

John Settle, Pruett's trial counsel, stated in his affidavit and his testimony during the hearing before this Court, that the pretrial publicity in Pruett's case was "horrendous." Settle also made the following comments in his affidavit:

9.... The animus in the county against Petitioner was so strong that I was unable to get the statutorily required eligible persons to sign affidavits that Petitioner could not get a fair trial in Sebastian County. No testimony or evidence was presented because even the state recognized the prejudice in the community and consented to the change.

10. The relief granted, however, did not help to diminish the prejudice. Article 2, section 10 of the Arkansas Constitution limits changes of venue to counties in the same judicial district. Because the Twelfth Judicial District is composed of only Sebastian and Crawford Counties, the trial was moved from Forth Smith to Van Buren. There was no more effect to that change than simply moving the trial across the river. Jury panels in both counties were exposed to the identical "self-confessed mad-dog killer" coverage of Petitioner. Potential jurors in both counties read the same newspapers, listen to the same radio stations and watch the same television stations.

11.... [W]hen it became obvious to me that members of the Crawford County jury panel knew Petitioner and the facts to be tried, I requested a continuance to prepare a motion for another change of venue.... [8]

The following exchange between Pruett's trial counsel and potential jurors in Crawford County, during voir dire, also gives the Court some indication of the extent of the pre-trial publicity in Crawford County that motivated Pruett's trial counsel to make a second request for a change of venue as well as a request for a continuance (see also E.H. 58–59):

### Juror Jewel Holder

Mr. Settle:

Q. What about if you were the defendant in this case? Would you want someone deciding whether or not you were

---

**8.** John Settle, Pruett's trial counsel, makes the following comments in paragraphs 1, 2 and 3 of his affidavit attached to the initial petition as exhibit I (see also E.H. 44–60):

1. I was appointed trial counsel ... on June 17, 1992.

2. In June and through most of July, 1982, I was in the midst of briefing an appeal in a complex capital case before the Arkansas Supreme Court.... I completely unable to devote any attention to Petitioner's case until July 27, 1982. With knowledge of my other commitments, the trial court nonetheless schedule

the trial to begin on August 30, 198[2]. That left slightly more than thirty days to prepare. No capital case, with a defendant's life on the line, can be prepared in only thirty days.

3. ... [O]n July 29, I moved before the trial court for a reasonable continuance. The same day ... the court held a hearing.... I barely had an hour's notice and did not even have time to collect the exhibit I had prepared in support of the motion. The motion was denied, although I was later permitted to file my exhibits.

guilty, knowing what you know, feeling the way you feel?

A. I think everybody in the community knows as much as I know about it.

Q. So, in other words, he is in a position where he is going to be choosing a Jury where people have already heard a great deal about him?

A. Yes. (Tr. 1127–1128).

### Juror Bobby Thrasher

Mr. Settle:

Q. Okay. Mr. Thrasher, have you heard anything about this case?

A. Yes sir.

Q. Could you tell me what you have heard about it?

A. Just the—er—news that I assume everybody else has heard.

Q. From where did you hear that, the newspaper?

A. News, well, not so much the newspaper as the television and radio.

Q. Could tell me what you've heard. . . .

A. Er—I guess the most thing I've heard that he has called himself a mad-dog killer. (Tr. 1157).

### Juror Diane Brandenburg

Mr. Settle:

Q. Earlier, you indicated that you had viewed what you termed a press conference?

A. Yes.

Q. Could you tell me—I believe you said that you heard him call himself a mad-dog killer and that he was on some sort of drug, do you recall what he was referring to?

A. I don't even remember, guessing now, I would say he was talking about killing people. (Tr. 2130–2131).

### Juror Sara Blevins Blan

Mr. Settle:

Q. Could you tell me what you do recall hearing?

A. That Mr. Pruett is accused of killing Bobbie Robertson behind a convenience store in October. That he has committed other crimes before.

Q. Like what?

A. He's accused or was convicted of killing other people. (Tr. 2370).

Close scrutiny of the voir dire proceedings reflects that at least twenty-two (33% of the first group of 65 potential jurors voir dired initially and 28% when combining the first 65 with the second group of 12 potential jurors called totaling 77) of the seventy-seven potential jurors responding to the summonses stated that based on what they had read and heard about the case, Pruett would have to offer evidence to establish his innocence before they could change their opinion that he is guilty as charged. In other words, virtually 1/3 of the seventy-seven potential jurors reporting readily admitted that they could not accord Pruett the presumption of innocence that every defendant enjoys under our criminal justice system at the beginning of a trial and enjoys until the State establishes the defendant's guilt by competent evidence beyond a reasonable doubt. (Tr. 1116, 1146, 1160, 1249, 1286, 1289, 1377, 1559, 1578, 1597, 1606, 1647, 1670, 1727, 1736, 1778, 1797, 1031, 1900, 1909, 1929, 1977, 2025, 2034).

The following illustrate some of the views expressed by these twenty-two potential jurors:

Q. Well, let me ask you this then. One of the principles that they talk about . . . is the view that a person is presumed to be innocent, that is the law says he's viewed to be innocent, can you honestly tell me, though, knowing what you know and hearing what you've heard, that you can look at the Defendant over here and say that yes, I can view him right at this point, right now, as being innocent?

A. No, sir, I couldn't.

Q. You could not say that?

A. No, sir.

Q. And why is that?

A. Er—just things that I've heard.

Q. So, you do have an opinion against this Defendant?

A. Er—I guess if you are going to put it like that, yes, sir.

Q. Would it take evidence for the Defendant to set aside that opinion?

A. Yes, sir. (Tr. 1160).

Mr. Fields:

Q. . . . Could you put aside anything that you may heard about this case up until this point and make a decision based only upon what you hear in the Courtroom?

A. I don't know.

Q. Okay. Do you understand that the Judge will instruct the Jury that the only thing that they can consider in the case is the testimony of witnesses under oath from the witness stand, where you are seated now, and also exhibits and documents that will be introduced as evidence allowed in by the Court and that that's the only thing that they can consider in this case?

A. Yes.

Q. Will you be able to do that if he tells you to do that?

A. Er—I don't know.

Q. Well, are there some things in this case that you think that you might not be able to disregard?

A. Well—er—of course, I read the publicity about it before, you know when it first happened.

Q. Have you ever read anything in the newspaper wasn't true?

A. Well, yeah, yeah.

Q. Do you understand that some of that may be inaccurate?

A. Yeah, I understand that.

Q. Okay.

A. But, you know—er—it would—er—it **would probably have an effect on my thinking, unless I could be proven, you know unless it could be proven without a shadow of doubt that it was different.**

. . . .

Q. Okay. So, in effect, what you're saying is that you would require the Defense to prove that what you had already read was wrong?

A. Right. (Tr.1289–90) (Emphasis added).

Mr. Fields:

Q. Could you put out anything that you may have heard about this case and base your decision only upon what you hear in Court?

A. I'm afraid not.

Q. You don't think so?

A. No, I really don't.

Q. Have you heard quite a bit about the case?

A. Yes, sir.

. . . .

Q. Okay. Have you heard so much that you don't think that you could give both sides a fair trial?

A. I wouldn't think so.

Q. You don't think you could?

A. No. (Tr. 1578, 1579).

Mr. Settle:

Q. Isn't it also true that it would require evidence to remove you knowledge from your mind for the defendant, and isn't it further true that you really could not eliminate this evidence from your mind, could you?

A. It would be difficult. (Tr.1778, 1779).[9]

9. Four potential jurors, Twyle Sims, Stella Simpson, Carolyn June Bell and Linda DeLaet, either knew the victim or the victim's immediate family. (Tr. 1019), 1585, 1895, 1913. Juror DeLaet further testified that the general feeling in the community was that defendant is guilty.

Jurors Carrol G. Hopkins, James Lynn Hughes, Diana S. Cagle, Bridgett A. Weisenfels, Bobby Thrasher, Laverne Redding and Ewell Titsworth stated that they heard about the case and could not disregard what they heard, or they would not want to serve as a juror because of what they had read or heard about the case or it would be easy to establish defendant's guilt. (Tr. 1579, 955, 956, 1009, 1046, 1171). The eleven potential jurors identified in this footnote constitute 14% of the individuals summonsed.

The twelve jurors who were found to be qualified had not only heard about the case, with the exception of one, but, in addition, had either seen Pruett on television in the custody of law enforcement officers, or had heard about Pruett's involvement in criminal activities in other states, that Pruett had referred to himself as a "mad dog killer," and at least one of the twelve expressed the following view:

"I can't forget that I heard it (mad dog killer) but, no, I don't think I would let that weigh into anything that was weighed in evidence because I think it should all come out, one way or the other, whether it was an accurate statement that he said it or the he didn't or what he meant by it." (Tr. 1752).[10]

Even the juror who served as foreman of the jury panel not only stated that he had read about the case and had seen Pruett on television, but stated further that "A. Well, as far as I can remember it seems like I heard that he was captured in Colorado or somewhere...." (Tr. 1531). See also: (Tr. 912, 954, 956, 1080, 1086, 1093, 1094, 1100, 1105, 1380, 1386, 1398, 1739, 1740, 1731, 1834, 1835, 1945, 1973, 1977, 1739, 1966, 1988). In this Court's opinion, this is the sort of background or setting where, as a matter of common sense, Pruett entered the trial not only facing the responsibility of proving his innocence, but further demonstrates that there was and remains substantial doubt that Pruett could then or ever get a fair and impartial trial in Crawford County. At least two potential jurors stated, in effect, that if they were in the shoes of Marion Albert Pruett and Pruett was on the jury sitting in judgment with their opinions, they would not want him on the jury.

This Court is persuaded that the trial judge's error lies in considerable degree in his failure to grant defense counsel's second motion for change of venue as well as counsel's request for a continuance in order to gather evidence to prove that potential jurors in Crawford County were so prejudiced by pre-trial publicity that Pruett could not get a fair trial.

The trial judge further erred in accepting at face value the belief of the jurors impaneled that they could ignore what they had read in newspapers, seen on television and heard and give Marion Albert Pruett the fair trial that was and is his right. The Supreme Court has on occasions issued a caveat against giving "dispositive" effect to jurors' sworn statements that they could and would ignore pre-trial publicity. See: *Sheppard v. Maxwell*, 384 U.S. 333, 353, 86 S.Ct. 1507, 1516, 16 L.Ed.2d 600 (1966); *Irvin v. Dowd*, 366 U.S. 717, 728, 81 S.Ct. 1639, 1645, 6 L.Ed.2d 751 (1961). Basically, the trial judge must bear in mind that a motion for change of venue raises not simply procedural points, but, as the Arkansas Supreme Court emphasized in *Cockrell v. Dobbs*, 238 Ark. 348, 381 S.W.2d 756 (1964), "The heart of Section 10 is its guaranty of an impartial jury. Any interpretation that destroys that guaranty is wrong." This Court further submits that the heart of a motion for change of venue is to afford the accused that most fundamental of all rights he possesses under our criminal justice system, his right to a fair trial before an impartial jury.

---

The following eleven potential jurors, Henry Arthur Stewart, Darrell Wayne Belt, Earnest Jones, Earl Harrison, Fay McCurdy, James Alphonso Johnson, Perry Cowan, Larry Rutledge, Leon Gilreath, Samuel Evans and Sharon J. Strobe, either failed to report or were excused because of some physical impairment, age or prior engagement. (Tr. 942,1863). These eleven potential jurors constitute 14% of the individuals summonsed.

10. While voir dire is intended to weed out potential bias jurors, according to extensive professional research and investigation, the average potential juror will be reluctant to disclose his biases and voir dire is frequently ineffective in discovering the extent to which a juror's vote may be affected by what he or she has heard about a case. See: Suggs and Sales, *Juror Self–Disclosure In The Voir Dire: A Social Science Analysis*, 56 Ind.L.J. 245 (1981); Fahringer, *In The Valley Of The Blind: A Primer On Jury Selection In A Criminal Case*, 43 Law & Contemp. Prob. 116 (1980); Broeder, *Voir Dire Examination: An Empirical Study*, 38 S.Calif.L.Rev. 503, 528 (1965). In addition, many potential jurors whose views may be substantially affected by pre-trial publicity may not know that they are incapable of sitting as fair and impartial jurors. See: *Fair Trial v. Free Press: The Psychological Effect of Pre–Trial Publicity On The Juror's Ability To Be Impartial*, 38 So. Calif.L.Rev. 672, 676–683 (1965).

**1078**

The Arkansas Supreme Court in reaching the conclusion that a fair and impartial jury had been impaneled to hear Pruett's case found that only three members of the panel "had prior knowledge of the facts of the case." As previously noted, this Court found that eleven members of the impaneled jury had knowledge about the case and only one member of the panel had not read or heard about the case. The following will demonstrate that eleven members of the panel had either read, heard or viewed television scenes regarding this case.

When asked if he or she, as the case might be, had read or heard about the case, the following responses were given by the twelve jurors impaneled to hear this case:

1. Deloyd Fay Burr, who served as foreman:

A. Well the only thing I have read is when it first happened in Fort Smith ... I do remember it (when Pruett was arrested) it was on television news. (Tr. 1530).

A. Well, as far as I can remember ... he was captured in Colorado or some where ... then he was brought back here three or four weeks ago. (Tr. 1531).

2. Randy E. Rider:

Q. You have read and heard accounts about this case?

A. Yeah, I have. (Tr. 917).

A. I have heard of him (Albert Pruett). (Tr. 918).

A. Just this incident that happened in Fort Smith, that's it. (Tr. 918).

3. James Lynn Hughes:

A. Very limited TV, the only thing I've heard that's on the radio that someone was murdered someone's charged ... (Tr. 954).

Q. Have you heard anybody express opinions as to whether he's guilty or not guilty?

A. Oh, yeah, yeah, you definitely hear that.

Q. What have you heard in that regard?

A. That he was guilty.

Q. Have you ever heard anybody express the opinion that he was not guilty?

A. No, sir. (Tr. 955).

A. I think I've just seen his picture in the paper, I don't believe I've seen him on TV.

Q. What can you—what do you know, Mr Hughes, about Pruett's background and past?

A. I believe the only thing I know is that he's been tried in Mississippi. (Tr. 956).

Q. Do you have any personal friends who are police officers or members of the Sheriff's Department?

A. My next-door neighbor is a constable....

Q. Has he said anything to you about this case?

A. No, sir. Yesterday he started to state something about it and I told him that I was a potential witness and then we didn't discuss any more about it. (Tr. 958).

4. Dee Wilcox:

A. I recall that the incident happened and that's about it.

Q. Do you recall when it happened?

A. No. Huh-uh.

Q. You do recall hearing of the case?

A. Vaguely, Huh-uh (yes). (Tr. 1080).

5. Marilyn Richmond:

A. Well, most of what I've heard is just after it happened when—when it was on the news.

A. It's been so long ago I don't know if I even remember or not. It was just that—er—that the girl was missing—er—then it was—er—that—er—maybe a day or so later that I heard that her body had been found that there was no suspect....

Q. Well, what have you heard about Mr. Pruett, the defendant?

A. That—er—he had been in a federal prison, had been released or paroled or—er—that he was a suspect. (Tr. 1093).

A. ....I'll have admit that and I did listen to the news on the radio and television when there was any bulletins....

A. No. er—now, I saw when they were bring him in, I saw the one where they were bringing him in to the Fort Smith Police Station.... (Tr. 1095).

A. Several people have talked about it, where I've heard it. (Tr. 1099).

Q. Have you heard people express their opinion that they thought he was guilty?

A. I'm sure a lot of 'em have. (Tr. 1100).

6. J.C. Hodges:

A. .... I—I read that—er—that the girl was—was found dead and I read that—er—that a man had been — charged with it and that's all—about all I've heard about it. (Tr. 1386).

Q. Did you hear any talk at work about it at all?

A. Very little—er—where I work. (Tr. 1387).

7. Mary Carter:

Q. .... Do you recall hearing anything about that or reading anything about that in the paper?

A. Oh, yes, I did.

A. Er—I recall hearing that a convenience store clerk was killed and—er—I don't know any specifics or recall specifics. (Tr. 1398).

A. .... I have heard that—er—er—the accused was also accused in other states....

A. Er—I have heard the—the phrase and I'm—I'm not certain it applies to this particular person because I do not follow names of accused—or—mad-dog killer. (Tr. 1399).

Q. Did you ever see Mr. Pruett on television?

A. Yes, I have seen him.

A. I've seen him, I believe, moving outdoors to and from a car. (Tr. 1400).

8. Carolyn Irene Hailey:

A. And I do remember that the incident did occur and I believe it was close to where I work, is supposedly where it happened.

Q. Did you hear anything about Mr. Pruett?

A. I knew that he was taken to another state. (Tr.1739).

A. No, I heard some statements on the radio of how he referred to himself when he was in Missouri or Mississippi or wherever he was.

A. How he referred to himself, evidently he was upset and he called himself a mad-dog killer, is what I heard.

Q. Did you hear this more than once?

A. Yes, to be honest, I did. (Tr. 1740).

A. I can't forget that I heard it but, no I don't think I would let that weigh into anything that was weighed in evidence because I think it should all come out, one way or the other, whether it was an accurate statement that he said it or that he didn't or what he meant by it. (Tr. 1752).

9. Lee Etta Wright:

A. Have not heard anything about case, I must have been out of town. (Tr. 1819).

10. Maureen Larue:

A. I just heard that he was accused of the crime.

A. I understood that a quickie mart had been robbed.

A. And that a woman had been taken. (Tr. 1834).

A. That he was accused of it and that he was picked up in another state.

Q. Did you ever see Mr. Pruett on the television?

A. Yes, I did at one time.

A. He was being handcuffed. (Tr. 1835).

11. Nellie Marie Shelly:

Q. Have you ever heard of Marion Albert Pruett?

A. Yeah, I've heard of it but I'd forgot all about it until—

Q. Do you remember anything about this particular case now?

A. No, not any more than what you said. (Tr.1953).

12. Richard Allured:

Q. Do you know anything at all about Mr. Pruett, have heard anything about him?

A. Other than what's been heard on the news, I have heard some reports that there had been something about some other crimes, yes.

Q. Okay. Tell me what you heard about that?

A. I heard that there have been some other convictions, yes.

Q. Okay. What have you heard about that, what convictions?

A. That he said he's been convicted of some other crimes of violence. (Tr. 1974).

A. I just heard they said he was convicted, I thought, of three other crimes.

Q. How did that affect you thinking about Mr. Pruett?

A. It could affect it in a negative way ... I would try very had to accept the evidence just on this particular case alone. (Tr.1975, 1976).

Q. Okay. Well, the reason I was asking you that, you said that what you had heard about Mr. Pruett could affect your thinking in a negative way

A. Yes.

Q. —possibly?

A. But I'd have to hear evidence from the Defense before I definitely made a decision like that.

Q. From the Defense?

A. Yes. (Tr.1977).

Significantly, the erroneous conclusion that only three jurors of the twelve impaneled had knowledge about the case as opposed to eleven, as the record reflects, raises an important question whether Pruett's case received the close scrutiny that is mandated on appellate review in a death sentence case. The comment in the Supreme Court's opinion that "it would have been better that the trial be continued for the reasons stated in the motions and due to the media attention given the case" was not the only alternative available to the trial court. The holding of the Arkansas Supreme Court in the case of *Cockrell v. Dobbs*, supra, makes it crystal clear that Section 10 of Article 2 of the Arkansas Constitution, authorizing a transfer to another county within the district is not the end within itself to be achieved, but, to the contrary, is simply a means to the end which is a guaranty of an impartial jury and any "interpretation that destroys that guaranty is wrong." In essence, the trial judge possessed the authority to transfer the case to a county substantially outside the coverage area. This Court is persuaded that the trial judge abused his discretion in failing to grant defense counsel's second motion for change of venue.

The following significant findings were made by the Arkansas Supreme Court, as set forth in its decision:

1. It is undisputed that the appellant was forced to accept jurors he would have peremptorily challenged had he not exhausted those challenges; [11]

2. It is likewise undisputed that publicity was great in Crawford County as well as Sebastian County; [12]

---

**11.** The trial court's refusal to excuse for cause jurors who were tainted by the massive pretrial publicity, violated Pruett's rights under the Fifth, Sixth and Fourteenth Amendments. Pruett was forced to expend his limited (12) preemptory challenges.

**12.** Media coverage of case:
A. Newspaper, Southwest Times Record:
Between October 16, 1981, to November 7, 1981, there were a total of 16 stories in the newspapers. Of the 16 articles, 10 appeared on page A–1. During this time frame there

were three references about the "mad dog" comment made by Pruett.

Between August 30 and September 7, 1982, seven articles appeared on page A–1. During this period at least two references were made about Pruett's "mad dog" comment.

On the first day of trial, August 30, 1982, a page A–1 articles captioned "Pruett Murder Trial To Open." This article stated, among other things, Pruett had received the death penalty in Mississippi and two life terms in Colorado. (E.R.120, 121, 122).

3. Perhaps it would have been better that the trial be continued for the reasons stated in the motions and due to the media attention given the case. *Pruett*, 282 Ark. at 307–309, 669 S.W.2d 186.

This Court is persuaded that the above findings mirror the doubt on the part of the Arkansas Supreme Court as to whether Pruett had been afforded the due process right to a fair trial, but resolved that doubt in favor of the State of Arkansas. Indeed, security of rights is not diminished in proportion to one's guilt. Any doubt, accordingly, should have been resolved in Pruett's favor.[13]

The Court is convinced that Pruett is entitled to the relief prayed for in this claim.

C. *Denial of Constitutional Rights Based on Admission of Hypnotically Refreshed Testimony Without Disclosure to Pruett*

 During the sentencing phase, the State called two witnesses to testify regarding the robbery of a savings and loan in Jackson, Mississippi in September, 1981, in which a bank teller had been abducted and killed. Betty Sibley, an eye witness and bank teller at the time, testified in detail regarding the events of the bank robbery and abduction. Pruett contends that the State failed to disclose information regarding the hypnosis of Sibley by FBI agents on September 26–27, 1981.

B. Television stations KFSM, KVHS and "numerous radio stations:"
The taped confession of Pruett where he referred to himself as a "mad-dog killer" was played "several times by virtually every station in Fort Smith." It became commonplace to talk about Pruett as a "self-confessed mad-dog killer." (E.R. 119 and affidavit of Davis Woods submitted as Exhibit H with initial petition).

13. In *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), the United States Supreme Court admonished that "[t]he state's interest in prevailing at trial—unlike that of a private litigant—is necessarily tempered by its interest in the fair and accurate adjudication of criminal cases. Thus, also unlike a private litigant, a state may not legitimately assert an interest in maintenance of a strategic advantage over the defense, if the result of that advantage is to cast a pall on the accuracy of the verdict obtained."

The problems surrounding the use of hypnotically-enhanced testimony are discussed in a civil case, *Sprynczynatyk v. General Motors Corp.*, 771 F.2d 1112, 1118–21 (8th Cir. 1985), *cert. denied*, 475 U.S. 1046, 106 S.Ct. 1263, 89 L.Ed.2d 572 (1986) where the Eighth Circuit held that the trial court should consider whether and to what degree certain safeguards had been followed before and during hypnosis in determining the admissibility of hypnotically enhanced testimony. *See Rock v. Arkansas*, 483 U.S. 44, 59–61, 107 S.Ct. 2704, 2713–14, 97 L.Ed.2d 37 (1987) (discussing problems with hypnosis, particularly in increasing the subject's incorrect recollections). *See also* 27 Charles Alan Wright & Victor James Gold, *Federal Practice and Procedure* § 6011 (1990).

The prosecutor testified at the evidentiary hearing that he did not know Sibley had been hypnotized prior to her testifying. (E.H.71). The Court finds the testimony credible and is not persuaded that the prosecutor intentionally withheld information regarding the hypnosis.[14] The fact that Sibley was hypnotized did not become known until the 1988 retrial supports this finding.

Nevertheless, the Court must find that the admission of the hypnotically induced testimony violated Pruett's rights under the Confrontation Clause. Respondent, however, contends that any error that might have occurred was harmless.

14. Pruett did not raise this issue in state court as he did not learn of the hypnosis until the retrial of his Mississippi charges in January, 1988. In its July 14, 1993, Order, the Court found that Pruett had established cause for the procedural default. Respondent asks that the Court reconsider its ruling in light of the prosecutor's statement. However, a showing that the factual or legal basis for the claim was not reasonably available to counsel, as is the case here, can establish cause. See *Cornell v. Nix*, 976 F.2d 376, 380 (8th Cir.1992), *cert. denied*, 507 U.S. 1020, 113 S.Ct. 1820, 123 L.Ed.2d 450 (1993) ("An external impediment can be 'the reasonable unavailability of the factual basis for the claim.'") (quoting *McCleskey v. Zant*, 499 U.S. 467, 497, 111 S.Ct. 1454, 1472, 113 L.Ed.2d 517 (1991)). As discussed *infra*, he has also established prejudice.

The proper standard, in this instance where the State has not conducted a harmless-error review, is the harmless-error standard of *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). *See Richley v. Norris*, 32 F.3d 1237, 1239 (8th Cir.1994). That is, the State must "prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."

Whether the error is harmless depends on a number of factors including (1) the importance of the witness' testimony, (2) whether the testimony was cumulative, (3) the presence or absence of corroborating evidence, (4) the extent of cross-examination, and (5) the overall strength of the prosecutor's case. *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986). The fifth factor requires the court "to examine the evidence presented by the prosecution which the jury may have considered in deciding to impose the death sentence." *Orndorff v. Lockhart*, 998 F.2d 1426, 1431 (8th Cir.1993), *cert. denied*, 511 U.S. 1060, 114 S.Ct. 1631, 128 L.Ed.2d 354 (1994).

The court in *Orndorff* described the analysis that must be followed in determining whether the constitutional error—the denial of the chance to cross-examine Sibley—was harmless beyond a reasonable doubt. 998 F.2d at 1431–32. The Court has conducted the analysis as directed by the Eighth Circuit and finds here that the error is not harmless beyond a reasonable doubt.[15]

There are "significant differences" between the pre- and post-hypnotic statements. The post-hypnotic testimony was more detailed, more embellished than Sibley's prehypnotic statements. For example, Sibley did not mention the telephone call either in her statement to police (see attached police re-

port to Respondent's First Set of Interrogatories and Requests, Document no. 60) or her pre-hypnotic statement as recorded on the videotape. The events surrounding the telephone call, based on Sibley's description during hypnosis, appeared to have had a terrorizing effect on her, as it was during this period of time that decisions had to be made as to whether to report the robbery.[16] Also, Sibley added at trial that the person on the telephone was Lowe's son "wanting to come and have lunch with her." (Tr. 2886).

Furthermore, Sibley makes no mention of a gun pre-hypnotically, yet post-hypnotically she recounts that Pruett "had the gun behind Mrs. Lowe's back forcing her—not forcing her, making her go out of the office."

The factors listed in *Van Arsdall* weigh in favor of Pruett. Sibley's testimony during the sentencing phase was important, although not necessary, in establishing the aggravating circumstance. Her testimony was not cumulative as she was the only occurrence witness to testify about the Mississippi robbery. There was no corroboration of traumatizing events surrounding the bank robbery. Sergeant McAlpin, of the Jackson Police Department, testified that Pruett was arrested and confessed to killing Peggy Lowe. (Tr. 2889–2890). Defense counsel did not cross-examine Sibley. He testified at the evidentiary hearing that had he known she had been hypnotized and been allowed to so testify, he would have cross-examined her. (E.H.96–97).[17]

The jury found two aggravating circumstances existed: that Pruett had previously committed another felony an element of which was the use or threat of violence to another person or creating a substantial risk of death or serious physical injury to another person and that the capital murder was com-

---

**15.** The prehypnotic statement is included as an attachment to Respondent's First Set of Interrogatories and Requests, located in the record as document no. 60. The videotapes were played at the evidentiary hearing but were not introduced into evidence at that time. The state has provided copies of the videotapes to the Court which will be made part of this record.

**16.** Neither Sibley nor Joyce Brown, the manager of the bank, reported the telephone call to police. Nevertheless, during hypnosis, Sibley testified at

length as to a telephone call Lowe received in her office.

**17.** It is quite likely that the trial court would have deemed some of her testimony inadmissible altogether. *See Rock v. State*, 288 Ark. 566, 708 S.W.2d 78 (1986) finding that hypnotically refreshed testimony is inadmissible *per se*. The Supreme Court reversed in *Rock v. Arkansas*, 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987).

mitted for pecuniary gain. One or more of the jurors found evidence presented that the capital murder was committed while the capacity of Pruett to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect, intoxication, or drug abuse. The jury then found that the aggravating circumstances outweighed beyond a reasonable doubt any mitigating circumstances.

The Court cannot say beyond a reasonable doubt that the variations in Sibley's testimony did not contribute to the jury's decision to sentence Pruett to death. Sibley's post-hypnotic statement gave a personalized account of Pruett as violent and threatening. The testimony concerning the telephone call from the victim's son strengthened the prosecutor's portrayal of Pruett as inhumane. As Arkansas is a weighing state, the admission of evidence which infects the aggravating circumstance taints the sentence. *Contra Sidebottom v. Delo*, 46 F.3d 744, 756 (8th Cir.), *cert. denied*, ___ U.S. ___, 116 S.Ct. 144, 133 L.Ed.2d 90 (1995) (Missouri is a non-weighing state and therefore existence of valid second aggravating factor precluded tainting of conviction and sentence because of invalid aggravating circumstance).

Thus, the Court finds that the admission of Sibley's testimony violated Pruett's rights under the Confrontation Clause and that the constitutional error was not harmless beyond a reasonable doubt.

The Court also finds that the admission of the hypnotically enhanced testimony violated Pruett's due process right to a fair sentencing hearing. The hypnosis had none of the procedural safeguards recommended in *Sprynczynatyk* and thus the testimony was inherently unreliable.[18]

At the beginning of the hypnotic session the hypnotist, six FBI special agents, and the FBI visual information specialist along with Sibley are all present in the room. One agent described the room as looking "like a stadium."

Dr. Meldin A. Gravitz, an expert in hypnosis, testified at the evidentiary hearing that having so many people in the room, coming and going, affects the reliability of the session. (E.H.188). At least two persons questioned Sibley. One was the agent, who was not trained in hypnosis. Furthermore, Dr. Gravitz noted that there was no pre-hypnotic description of Pruett with which to compare the description given by Sibley during hypnosis. Thus, there is no basis to determine the reliability of the description. (E.H.191).

There are breaks in the tape where it is impossible to determine what happened. (E.H.191). Thus, there is no accurate record of the entire proceeding.

Dr. Gravitz opined that the preparation of Sibley for regression was insufficient to produce an adequate regression. (E.H.193). There is indication, according to Dr. Gravitz, that during the hypnosis Sibley's inaccurate recollection was reinforced. (E.H.194–195). Thus, there was greater potential for Sibley to confabulate.

In sum, the Court finds that Pruett is entitled to relief on this ground.

### D. *Jurors' Violation of Oath*

■ Pruett asserts that Juror Hodges was not truthful during the voir dire proceedings as he did not state that he preferred the death penalty to a sentence of life without parole. In an affidavit submitted with the Rule 37 petition (and submitted with the original habeas petition as exhibit J), Hodges states: "To me the death penalty is less severe than a life sentence. People should not be locked up. It makes them mean." However, this statement is hardly an indication that Hodges would have automatically given death. In an earlier statement in the affidavit, Hodges states: "Pruett's parents

---

**18.** The safeguards suggested in *Sprynczynatyk* include: (1) The hypnotic session should be conducted by an impartial licensed psychiatrist or psychologist trained in the use of hypnosis and thus aware of its possible effects on memory; (2) information given to the hypnotist by either party concerning the case should be noted; (3) before hypnosis, the hypnotist should obtain a detailed description of the facts from the subject; (4) the session should be recorded so a permanent record is available; (5) preferably only the hypnotist and subject should be present. 771 F.2d at 1123, n. 14.

and friends did not testify at his trial. I would have been interested and listened to testimony from them *before deciding on a sentence.*" (emphasis added).

The Court finds that Pruett is not entitled to relief on this claim.

### E. Denial of Right to Expert Psychiatric Assistance at Guilt–Innocence and Penalty Phases

■ Pruett's primary theory of defense and in mitigation was that he did not have a culpable mental state at the time he committed the crimes with which he was charged. Pruett contends that he was denied the assistance of a psychiatric expert who could examine Pruett, analyze whether the defense of mental incapacity was viable, assist in trial preparation, and present expert testimony at trial. Pruett states that he was denied access to psychiatric assistance because the trial court refused defense counsel time to locate an expert and the necessary funds to retain someone who was qualified.

Defense counsel had located Dr. Stross, an expert in forensic psychology who counsel believed could testify as to the effects of cocaine on Pruett's state of mind at the time. The trial court, however, denied Stross' request for a $5,000.00 and defense counsel's request for a continuance to locate another expert.[19]

Defense counsel was able to retain the services of Dr. Douglas Stevens. The trial court approved the payment of $1200.00 for Dr. Stevens.

Due process gives Pruett the right to an expert who will "assist in evaluation, preparation, and presentation of the defense," but it does not give a defendant the right to assistance from the expert of his choice. *Starr v. Lockhart,* 23 F.3d 1280, 1289–90 (8th Cir.), *cert. denied,* 513 U.S. 995, 115 S.Ct. 499, 130 L.Ed.2d 409 (1994). "In capital cases, an indigent defendant whose mental condition may be at issue is entitled to an examination aimed at evaluating, preparing, and presenting mitigating psychiatric evidence." *Boliek v. Bowersox,* 96 F.3d 1070, 1073 (8th Cir.1996) (citing *Starr* ). *See also Parker v. Norris,* 64 F.3d 1178, 1182–1185 (8th Cir.1995), *cert. denied,* — U.S. —, 116 S.Ct. 820, 133 L.Ed.2d 764 (1996).

Dr. Stevens, a clinical psychologist, testified at both the guilt and penalty phases. At the guilt stage, Dr. Stevens testified about the effects of cocaine and alcohol and opined that under the influence of the drugs Pruett could not form the criminal intent. (Tr. 2717—2723).

In addition to Dr. Stevens, Dr. Fahmy Malak, the state medical examiner, was called by the defense during the guilt stage and testified as to the effects of cocaine. (Tr. 2599).

During the penalty phase, Dr. Stevens testified about the results of tests he gave Pruett and the effects of cocaine and amphetamines on Pruett. He discussed amphetamine psychosis and cocaine psychosis and the characteristics of each. Dr. Stevens opined that Pruett was suffering from psychosis from the combined effects of both cocaine and amphetamine at the time of the offense. He further opined that the crime would probably not have occurred had it not been for the drugs. (Tr. 2927–2956).

The Court finds that Dr. Stevens was sufficiently qualified to meet the requirements of expert assistance required by *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). Pruett states that he needed an expert more qualified that Dr. Stevens, but does not indicate what more, if anything, a different expert could have offered. Indeed, that some of the jurors found the existence of the mitigating circumstance that the capital murder was committed while the capacity of Pruett to appreciate the wrongfulness of his conduct or to conform his

---

19. The trial court agreed to authorize a sum of money for an expert, but refused to approve the $5,000.00 fee. The court reviewed Dr. Stross' resume, found that he had strong training and experience as a psychiatrist, but did not "give a lot of details about any special knowledge he had in the area of drugs or narcotics." The court then said: "If the Defense can locate an expert witness who will testify for a reasonable fee, then I'll be glad to consider it. Or if Dr. Strauss [sic] will reduce his fee from the five-thousand-dollar figure, I'll be glad to consider that, also." (Tr. 543–544).

conduct to the requirements of the law was impaired as a result of mental disease or defect, intoxication, or drug abuse supports the finding that Dr. Stevens was a competent expert. (Tr. 101).

In sum, the Court finds that Pruett has not established an Ake violation.

F. *The Instructions Were Constitutionally Defective Because They Did Not Describe the Nature and Function of Mitigating Circumstances*

Pruett contends that the instructions during the penalty phase did not include a definition of mitigating circumstances and were therefore constitutionally inadequate. This argument, raised by Pruett in his Rule 37 petition, was found to be without merit by the Arkansas Supreme Court which stated:

> The language used by the legislature in naming the elements of mitigation cannot be said to be vague and beyond the common understanding and experience of the ordinary juror.

287 Ark. at 132, 697 S.W.2d 872.

▮ The word "mitigating" is not an uncommon word, and the jury was instructed on examples of mitigating circumstances which they could find present. Thus, the Court finds this claim to be without merit.

G. *The Burden of Proof on an Essential Element of Capital Murder was Impermissibly Shifted to Pruett*

▮ Pruett claims that the burden of proof was impermissibly shifted because he was required to prove by a preponderance of the evidence that he did not have the culpable state of mind to sustain a charge of capital murder and its less included offenses.

The Court finds this claim to be without merit. The state was required to prove beyond a reasonable doubt all the elements of the offense of capital murder. Proof of the nonexistence of an affirmative defense is not constitutionally required. *Patterson v. New York,* 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977) (requiring defendant to prove by preponderance of evidence affirmative defense of extreme emotional disturbance does not violate Due Process Clause). *See also Martin v. Ohio,* 480 U.S. 228, 235, 107 S.Ct. 1098, 1102–03, 94 L.Ed.2d 267 (1987) (placing burden of proving self defense on defendant does not violate due process).

H. *The Jury Was Not Instructed That They Could Not Impose the Death Penalty Unless They Found that Pruett Intended to Take Life*

Pruett argues that the capital murder statute is unconstitutional because its does not require a finding that a perpetrator acted deliberately with the specific intent to kill.

The Arkansas Supreme Court, in Pruett's Rule 37 petition, rejected the argument. The court found that the wording of the capital murder statute, Ark. Stat. Ann. § 41–1501 (Repl.1977), i.e., "causes the death of any person under circumstances manifesting extreme indifference to the value of human life," "indicates that the perpetrator of capital murder must act with deliberate conduct which culminates in the death of some person." 287 Ark. at 132–133, 697 S.W.2d 872. The Arkansas Supreme Court has held that the capital murder statute satisfies the constitutional requirements of *Tison v. Arizona,* 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987). *Burnett v. State,* 295 Ark. 401, 749 S.W.2d 308 (1988).

The Court, therefore, denies this claim.

I. *Pruett's Right Against Self–Incrimination Was Violated*

▮ Pruett claims that his right not to testify was violated when defense counsel named Pruett as a potential witness during voir dire and when the prosecutor asked Dr. Stevens if he put his patients under oath.[20]

---

**20.** In his second amended petition for writ of habeas corpus, Pruett states that defense counsel was required to read a list of potential witnesses, including Pruett, to prospective jurors. In his post-hearing memorandum, Pruett states that his right to self-incrimination was violated because the "state included Mr. Pruett's name in voir dire as a potential witness." (Post-hearing memorandum at 22). This latter statement is in error, as the record reflects that defense counsel listed Pruett as a possible witness. (Tr. 747, 2059).

The Arkansas Supreme Court, in ruling on Pruett's Rule 37 petition, also erroneously noted

The Court does not find that Pruett suffered any prejudice by the inclusion of his name by defense counsel as a potential witness. Furthermore, the Court is not persuaded that the question asked of Dr. Stevens is "a commentary on the defendant's failure to testify." The statement was not a direct reference to Pruett's failure to testify, and it did not call attention to the fact that he did not testify. *Pollard v. Delo*, 28 F.3d 887, 890 (8th Cir.), *cert. denied*, 513 U.S. 1003, 115 S.Ct. 518, 130 L.Ed.2d 423 (1994) ("we frankly cannot see how anyone could naturally take this statement to be a comment on [defendant's] failure to testify.").

The Court, therefore, denies this claim.

### J. The Death Penalty is Discriminatorily Applied in Arkansas

■ Pruett claims that the Arkansas death penalty is discriminatorily applied against defendants who are poor, who are accused of killing whites, and who are black. Pruett, who is white, was convicted of murdering a white woman.

Reliance on a statistical study was rejected in *McCleskey v. Kemp*, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987). Pruett has not offered any evidence that the decisionmakers in his case acted with discriminatory purpose or that the Arkansas capital punishment system operates in an arbitrary and capricious manner.

The Court finds this claim to be without merit.

### K. Ineffective Assistance of Counsel

Pruett alleges that his counsel was ineffective for a number of reasons. In particular, Pruett contends that (1) counsel failed to investigate evidence to be used in mitigation; (2) counsel failed to request more than 12 peremptory challenges; (3) counsel failed to adequately voir dire prospective jury members; (4) counsel failed to object to the instruction that impermissibly shifted the burden of proof of Pruett's mental state to Pruett; (5) counsel failed to introduce evidence of Pruett's conduct that supported his theory that persistent drug abuse impaired his ability to reason and led to impulsive, irrational behavior; and (6) defense counsel failed to request a mistrial or a cautionary instruction in regard to the testimony concerning Pruett's capital murder conviction in Mississippi.

In order to show that his counsel was ineffective, Pruett must first show that his counsel's performance was deficient, that is that his representation fell below an objective standard of reasonableness. Then, Pruett must show that there is reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 688, 694, 104 S.Ct. 2052, 2064–65, 2068, 80 L.Ed.2d 674 (1984). In the case of a death sentence, "the issue is whether there is a reasonable probability that, but for counsel's deficient performance, the jury would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death." *Antwine v. Delo*, 54 F.3d 1357, 1365 (8th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 753, 133 L.Ed.2d 700 (1996).

Pruett argues that the ineffectiveness of counsel was the product more of the state trial court's unreasonable refusal to grant defense counsel reasonable time to prepare for trial and funds to conduct an adequate defense than a product of counsel's inadequacies. At the evidentiary hearing, defense counsel testified that he had about a month to prepare for trial. (H.T.42). Such time was unreasonable, according to defense counsel, but the trial court denied his requests for continuance.

■ The Court finds that most of the alleged deficiencies are without merit. For example, Pruett contends that his counsel failed to request more than twelve peremptory challenges. Arkansas law at the time provided that the defense was entitled to 12 peremptory challenges. See Ark.Code Ann. § 16–33–305 (1987).

that the State included Pruett's name in voir dire as one of the potential witnesses. 287 Ark. 124, 134, 697 S.W.2d 872. The Court has reviewed the entire record and has not found any reference by the prosecutor as to Pruett being a witness.

■ Similarly, Pruett cannot show that his counsel was deficient for failing to object at trial to an instruction that allegedly shifted the burden of proof to him regarding his affirmative defense.

■ The Court also finds that counsel adequately presented evidence to support the defense theory of persistent drug abuse. He was able to secure the services of Dr. Stevens, who the Court found provided competent testimony at both the guilt and penalty phases. He used Dr. Malak, the state's medical examiner, as a defense witness to testify about the effects of cocaine. (Tr. 2598). He introduced medical records of Pruett's visit shortly before the murder to an emergency room with a broken needle in his arm which corroborated Pruett's assertion of cocaine use. Dr. Kutait, a Fort Smith physician, also testified as to his observance of needle tracks on Pruett's arms. (Tr. 2715).

Other than the mere assertion that another expert would have been "more qualified," Pruett has not presented any evidence to demonstrate that counsel's performance was deficient in presenting his defense.

■ Pruett's claim that counsel was deficient for failing to object to testimony regarding his Mississippi death sentence also must fail. At an in-chambers discussion regarding the introduction of the previous convictions, defense counsel did object to introduction of the judgment and commitment of the Southern District of Mississippi concerning Pruett's robbery and kidnapping conviction. (Tr. 2894, 2904). In addition, there was no basis for counsel to object to the testimony of either prosecution witness at the sentencing phase.[21]

■ The claim that counsel failed to investigate and present mitigating evidence does give the Court some pause. There can be no doubt of the importance of mitigating evidence to "neutralize the aggravating circumstances advanced by the state...." *Starr v. Lockhart*, 23 F.3d 1280, 1285 (8th Cir.

1994). *See Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964–65, 57 L.Ed.2d 973 (sentencer should "not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record....") " 'Given the severity of the potential sentence and the reality that the life of [the defendant'] was at stake, 'we believe that it was [counsel's] duty ... to collect as much information as possible about [the defendant] for use at the penalty phase of his state trial." *Hill v. Lockhart*, 28 F.3d 832, 845 (8th Cir.1994), *cert. denied*, 513 U.S. 1102, 115 S.Ct. 778, 130 L.Ed.2d 673 (1995) (citation omitted).

At the evidentiary hearing, defense counsel John Settle testified that Pruett refused to give him any information regarding his past and his family.[22] Settle stated that Pruett told him "that he did not want any contact with his family, he did not want them involved." (E.H.75). Pruett had previously been convicted of a felony in Colorado, and Settle called the Colorado Public Defender's Office to determine if it had any information about Pruett's family or background. (E.H.76). Settle was unable to obtain information because Pruett had not had a trial on the Colorado charges. (E.H.77).

Settle subpoenaed a witness who had testified for Pruett during the mitigation phase of his first Mississippi capital murder trial. However, the day before the witness was to testify at the Arkansas trial, Pruett advised Settle that he did not want to put the witness on because she had been "run over pretty thoroughly in the Mississippi trial," and Pruett did not want the witness to suffer again. (E.H.79).

In support of his argument that Settle should have investigated and presented mitigating evidence, Pruett included the affidavits of Pruett's parents and another couple who were family friends with his Rule 37 petition. (See Exhibits K, L and M to the Application for Writ, document no. 2). The

---

**21.** Counsel was not aware at the time Sibley testified that she had been hypnotized. Thus, counsel could not have objected to her post-hypnotic testimony at trial.

**22.** Pruett did not offer any evidence at the evidentiary hearing concerning his counsel's failure to investigate and offer mitigating evidence. Thus, Settle's assertion that Pruett refused to provide any information remains unrefuted.

affiants indicate that Pruett did not get in trouble as a youngster, that he was a good son and brother, was a hard worker in school, and was a speed skating champion.

Such information might have been helpful and may have altered the balance of aggravating and mitigating circumstances in the penalty phase to create the reasonable probability that the jury would not have sentenced Pruett to death. *See Antwine*, 54 F.3d at 1368. However, without Pruett's assistance in obtaining the names of possible witnesses and in light of Pruett's insistence that his family not be involved, the Court cannot find that counsel's performance was deficient.

In sum, the Court denies the ineffective assistance of counsel claim.

### L. *Pruett Was Denied a Fair Trial Because of Prosecutorial Misconduct*

Pruett contends that during the trial the prosecutor made improper argument. In particular, at the guilt-innocence stage in rebuttal to closing argument by defense counsel, the prosecutor argued:

All the defendant is entitled to is a fair trial. He's had two attorneys appointed for him. They've given him the best defense and you see, yourself, everything has been fight, fight, fight in this case. (Tr. 2870).

Defense counsel objected to this statement. The trial court then admonished the jury to disregard the prosecutor's remarks that Pruett is represented by appointed counsel. The trial court specifically stated:

That has no relevant to the merits of the case and I'm instructing you to put that out of your mind completely when you deliberate on this case. (Tr. 2872).

Pruett argues that during the sentencing hearing the prosecutor did not fully inform the jurors that they could return the death penalty only if the aggravating circumstances outweighed the mitigating circumstances *beyond a reasonable doubt.* (Tr. 3019).[23]

Pruett also argues that the prosecutor improperly expressed his opinion about the death penalty during the sentencing hearing. In particular, the prosecutor stated:

If we do not sentence people like Marion Pruett to the death penalty, we will never have a deterrent on people who can kill like this, viciously, again and again. Ladies and gentlemen, I am asking you for the death penalty. I don't think that you could ever think that this person does not deserve it under the facts of all the cases that you've heard here.

(Tr. 3031–3032).

"Some comments 'so infect the trial with unfairness as to make the resulting [sentence] a denial of due process.'" *Miller v. Lockhart*, 65 F.3d 676, 683 (8th Cir.1995) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974)).

■■■ The Court has reviewed the statements and finds that the trial court's instruction regarding the prosecutor's statement during the guilt-innocence phase was sufficient to cure any prejudicial effect the statement may have had.

■■■ The Court is not persuaded that the jury was misled or that Pruett was denied due process by the prosecutor's failure to advise the jury that aggravating circumstances must outweigh mitigating factors beyond a reasonable doubt. The trial court specifically instructed the jury as to the burdens. (Tr. 3014–3015). The verdict form required that the jury find that the aggravating circumstances outweigh beyond a reasonable doubt any mitigating circumstances. (Tr. 102).

■■■ Similarly, the Court cannot find that the statement concerning the propriety of the death penalty was prejudicial. In no respect do the comments approach those condemned in *Antwine v. Delo*, 54 F.3d 1357, *Newlon v. Armontrout*, 885 F.2d 1328 (8th

---

23. The prosecutor stated:
 What the defense is going to ask you to do is speculate well, maybe he was [under the influence of drugs], but ladies and gentlemen, even if you find that mitigating circumstance, again,

keep in mind, that the aggravating circumstances outweigh that in your mind. Then, the Court's instructed you that you should return the death penalty. (Tr. 3019).

Cir.1989), *cert. denied,* 497 U.S. 1038, 110 S.Ct. 3301, 111 L.Ed.2d 810 (1990) or *Miller,* 65 F.3d at 682. *See also Six v. Delo,* 94 F.3d 469, 477 (8th Cir.1996) (prosecutor's remarks during penalty phase regarding propriety of death penalty "were not egregious or pervasive enough to render the result of the penalty phase unreliable.")

The Court finds that Pruett is not entitled to relief on this claim.

### M. *The Trial Court Failed to Excuse Jurors for Cause*

Given the fact that the Court has already dealt with the issue concerning the Crawford County venire's taint due to the pre-trial publicity and the additional factor that the Court is not persuaded that the use of the preemptory challenges by the State violated any basic constitutional rights, the Court will deny this claim.

### N. *The Trial Court's Instructions and the Confusing Verdict Form Would have Misled a Reasonable Juror as to the Obligation of Each Juror to Consider Relevant Mitigating Evidence*

 Pruett argues that the verdict form regarding mitigating evidence was confusing, and that the trial court failed to instruct the jury that it did not need to consider only mitigating circumstances that it unanimously found to exist. Pruett argues that the verdict forms violate *McKoy v. North Carolina,* 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990) and *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), where the Supreme Court held invalid mitigating-circumstances instructions that contained a unanimity requirement.

At the jury instruction conference at the sentencing phase, defense counsel objected to any instruction that the finding of mitigating circumstance has to be unanimous. (Tr. 2975, 2976). Defense counsel also objected to the use of the verdict form which contained four parts. (Tr. 2978). The trial court, however, overruled the objection and gave the instruction then set forth in Arkansas Model Jury Instructions—Criminal 1509.

The jury was instructed as follows with regard to mitigating instructions:

If you do unanimously find one or more aggravating circumstances, you should then complete Form 2, which deals with mitigating circumstances. Form 2 lists some factors that you may consider as mitigating circumstances. However, you are not limited to this list. You may, in your discretion, find other mitigating circumstances.

Unlike an aggravating circumstance, you are not required to be convinced of the existence of a mitigating circumstance beyond a reasonable doubt. A mitigating circumstance is shown if you believe from the evidence that it probably existed.

Form 2 is made up of four parts. Part A is a list of mitigating circumstances to be checked only if you unanimously agree that a particular circumstance existed. Part B is a list to be checked where some of you think a circumstance existed, but all do not agree. Part C is a list to reflect circumstances of which there may have been some evidence but no member of the jury feels that the circumstances existed. The last part D is to be checked only if the jury concludes that there is no evidence of mitigating circumstances.

(Tr. 3013–14).

The form dealing with mitigating circumstances had four sections to it. Under Part A, the jurors were to check where applicable those mitigating circumstances they *unanimously* found to have probably existed at the time of the murder. Under Part B, one or more jurors were to check those mitigating circumstances which they found probably existed, but on which the jury did not unanimously agree. Under Part C, the jurors where instructed to check those mitigating circumstances on which there was evidence, but on which the jury unanimously agreed did not exist at the time of the murder, and under Part D, the jurors were to check if there was no evidence of any mitigating circumstances.

The jury was then instructed that it was to complete Form 3, and impose the death penalty only if: One or more aggravating circumstances existed beyond a reasonable

doubt; that the aggravating circumstances outweighed beyond a reasonable doubt any mitigating circumstances found to exist; and that the aggravating circumstances justify beyond a reasonable doubt the sentence of death. (Tr. 3014–15).[24]

It appears that the jury instructions are somewhat confusing, particularly in discerning the difference between part B and part C of Form 2.[25] However, the Court cannot find that the instructions or the verdict form runs afoul of *McKoy* or *Mills*. Unlike *Miller v. Lockhart*, 861 F.Supp. 1425, 1441 (E.D.Ark. 1994), *aff'd on other grounds*, 65 F.3d 676 (8th Cir.1995), the court did not inform the jury that its findings regarding mitigating circumstances must be unanimous. Here, jurors were instructed that they could consider any mitigating circumstance in their weighing process. Thus, the Court cannot find that Pruett's constitutional rights were violated by the manner in which the jury was instructed or the forms used in the sentencing phase.[26]

### III. Constitutionality of Extradition

Pruett challenges the constitutionality of his extradition from Mississippi to Arkansas. In particular, he asserts the following grounds: (1) that Arkansas' exercise of jurisdiction over him violated his right to be present in Mississippi at his motion for a new trial; (2) that Arkansas' exercise of jurisdiction violated his right to consult with his counsel concerning his motion for new trial and for extradition; (3) that Arkansas' exer-

cise of jurisdiction violated his right to a review by habeas corpus of the Order of extradition; and (4) that Arkansas' exercise of jurisdiction is unconstitutional because the extradition documents are insufficient on their face.

The record is somewhat unclear as to the status of the post-conviction proceedings of the Mississippi conviction. Pruett contends that after his conviction in Mississippi in 1988, his counsel requested an extension of time to file a motion for new trial. The trial judge granted Pruett until April 1, 1988 to file the motion. Pruett's Mississippi counsel also announced in open court their intention to oppose any attempt by Mississippi to extradite Pruett to Arkansas.

In March, 1988, Pruett's Mississippi counsel spoke with the extradition coordinator for the Governor of Mississippi. Counsel informed the extradition officer of Pruett's pending litigation in Mississippi, and of Pruett's right to counsel during the preparation and litigation of the motion for new trial. Counsel also advised Pruett to oppose any attempt to extradite him to Arkansas, and assert his right to a hearing.

Despite the attempts of counsel to be notified of any attempts to extradite Pruett, counsel did not learn of the extradition until he received a call on March 7, 1988, informing him that Mississippi Governor Mabus had held a press conference that afternoon an-

---

**24.** As noted above, the jury checked under Part C, that there was evidence of the following mitigating circumstance (which they unanimously agreed did not exist at the time of the murder), that the capital murder was committed while the capacity of Pruett to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect, intoxication, or drug abuse. (Tr. 101).

**25.** This confusion is somewhat rectified in the recent jury instructions issued in 1994. *See* AMCI 2d 1008. The jury is instructed that: "Part B is a list to be checked where some of you think that a circumstance existed, but all do not agree. Part C is a list to reflect circumstances of which there may have been some evidence but no member of the jury feels that the evidence was mitigating."

Part C on Form 2 contains the following language: "There was evidence of the following circumstances, but the jury unanimously agreed that they were not mitigating circumstances."

**26.** The Eighth Circuit recently addressed whether *Mills* and *McKoy* could be applied retroactively. *Miller v. Lockhart*, 65 F.3d 676, 685 (8th Cir.1995). It held that the two cases announced a "new rule" of law that could not benefit the petitioner in his collateral attack. Pruett argues that *Miller* is inapposite as the petitioner in *Miller* did not argue that any of the exceptions in *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) applied. Pruett asserts that the second exception in *Teague* removes this case from the *Teague* bar. As the Court finds that Pruett has failed to establish a violation, it need not address whether the exception exists in this case.

nouncing that Pruett was on his way to Arkansas.

Pruett never filed a motion for new trial in Mississippi. On April 1, 1988, Pruett filed a motion to hold critical stage of proceedings in abeyance and produce defendant. (See Exhibit attached to Document No. 13, Petitioner's Response to Status Report Filed by Respondent). The motion recited the events leading to Pruett's extradition to Arkansas, objected to the actions taken by the Governor, and asked that the Mississippi trial court hold further proceedings on the motion for new trial in abeyance. The trial court did not rule on the motion.

■ Even assuming that there is a valid post-conviction motion pending in Mississippi, the Court cannot find that Arkansas' exercise of jurisdiction violated Pruett's right to be present at the proceeding or to consult with counsel. The State of Arkansas states that it is ready to permit Pruett to return to Mississippi for any hearing on a motion for new trial. Furthermore, even assuming that Pruett had a constitutional right to consult with counsel concerning his motion for new trial, the Court cannot find that Pruett was denied that right. Pruett's counsel had access to him by mail, personal visits, and telephone. Counsel has not indicated any way in which he was impeded in his ability to communicate with or represent Pruett, other than the inconvenience of having a client who is incarcerated in another state.

■ Extradition proceedings are "intended to be a summary and mandatory executive proceeding." *Michigan v. Doran,* 439 U.S. 282, 288, 99 S.Ct. 530, 534, 58 L.Ed.2d 521 (1978). There is no constitutional right to an attorney or a hearing. Furthermore, Pruett was not entitled to any transfer hearing under the Uniform Criminal Extradition Act Mississippi had not adopted the Uniform Act. *See Cuyler v. Adams,* 449 U.S. 433, 443, 101 S.Ct. 703, 709, 66 L.Ed.2d 641 (1981). Thus, Pruett's claims that he denied those rights are without merit.

■ On June 11, 1987, Arkansas demanded the extradition of Pruett. Pruett's final

argument is that the extradition documents are invalid because he was not a fugitive at the time of the extradition.

A fugitive from justice is a person who is 1) suspected of or has been convicted of committing a crime, 2) sought by the jurisdiction so that the jurisdiction may subject the person to its criminal justice system, and 3) has left the jurisdiction and is found within the boundaries of another.... Thus, "all that is necessary to convert a criminal under the laws of a State into a fugitive from justice is that he should have left the State after having incurred guilt there."

*Gee v. State of Kan.,* 912 F.2d 414, 418 (10th Cir.1990) (citations omitted).

Here, Pruett had already been convicted of a crime in Mississippi. He was named as the person to be extradited in the documents. Pruett was a "fugitive" within the meaning of an extradition proceeding.

In sum, the Court finds that there is no merit to Pruett's challenge to his extradition or his claim that Arkansas' exercise of jurisdiction over him is unconstitutional.

## SUMMARY

The Court has thoroughly reviewed the voluminous record in this case. Careful scrutiny is absolutely mandated, for "[d]eath is the most extreme form of punishment to which a convicted criminal can be subjected. Its execution is final and irrevocable." *State v. T. Makwanyane and M. Mchunu,* Constitutional Court of Republic of South Africa, Case No. CCT/3/94, par. 26 (June 6, 1995) (holding death penalty in South Africa unconstitutional). Indeed, Justice Blackmun, after years of upholding the constitutionality of the death penalty, declared that the death penalty as currently administered is unconstitutional, that is it cannot be administered consistently, rationally, and fairly. *Callins v. Collins,* 510 U.S. 1141, 114 S.Ct. 1127, 127 L.Ed.2d 435 (1994) (J. Blackmun, dissenting).[27]

The death penalty continues to be an approved form of punishment in the State of

---

27. On February 3, 1997, the American Bar Association's (ABA) House of Delegates, which makes policy for the 370,000 lawyers in the group, voted for a nationwide freeze on the death penalty. A report accompanying the recommendation for ABA action stated that the action was neces-

Arkansas. The federal judiciary must, to the best of its ability, try to ensure that it is not applied unfairly or arbitrarily. A petitioner is entitled to know that a judge has fully reviewed his or her claims. Hasty decisions are not warranted when one's life and rights are at stake.

The Court finds, after review of the record, that Pruett's constitutional rights were violated as follows:

A. The state trial court failed to protect Pruett's right to a fair trial free from community prejudice in denying Pruett's second request for a change in venue and denying Pruett's request for a continuance in order to gather facts to support a change of venue;

B. When hypnotically-refreshed testimony was introduced at the sentencing phase.

Accordingly, the Court finds that both Pruett's conviction and sentence should be vacated, set aside and held for naught. The State is afforded 120 days from the file-date of this memorandum opinion and judgment in which to retry Pruett. If the State fails to do so, this Court will order Pruett's immediate release.

sary because "efforts to forge a fair capital punishment jurisprudence have failed. Today, administration of the death penalty is a haphazard maze of unfair practices with no internal consistency."