**Kevin Richard JOHNSON, Appellant,**

v.

**Crispus C. NIX, Appellee.**

**No. 84–1698.**

United States Court of Appeals,
Eighth Circuit.

Submitted Dec. 14, 1984.
Decided June 3, 1985.

Robert A. Wright, Jr., Des Moines, Iowa, for appellant.

Thomas D. McGrane, Des Moines, Iowa, for appellee.

Before HEANEY, ROSS and FAGG, Circuit Judges.

FAGG, Circuit Judge.

Following a nonjury trial, Kevin Johnson was convicted of the first degree murder of his infant son, Kevin, Jr. His conviction was affirmed by the Iowa Supreme Court, *State v. Johnson*, 318 N.W.2d 417 (Iowa 1982). Johnson subsequently filed a habeas corpus petition under 28 U.S.C. § 2254. In his petition, Johnson asserts that incriminating statements made by him and admitted into evidence were made in violation of his fifth and sixth amendment right to counsel and thus should have been suppressed. Johnson also asserts that pervasive media coverage surrounding his case denied him of his right to an impartial jury and a fair trial. The district court denied his petition. We affirm.

As an initial matter, we note that this court, in reviewing Johnson's state court conviction, must accord state court findings of fact a "high measure of deference," *Sumner v. Mata*, 455 U.S. 591, 598, 102 S.Ct. 1303, 1307, 71 L.Ed.2d 480 (1982); *Graham v. Solem*, 728 F.2d 1533, 1540 (8th Cir.1984), and may not set aside a state court's findings of fact unless we can reasonably conclude "that the state court findings lacked even 'fair[ ] support[ ]' in the record," *Marshall v. Lonberger*, 459 U.S. 422, 432, 103 S.Ct. 843, 850, 74 L.Ed.2d 646 (1983); 28 U.S.C. § 2254(d)(8). Keeping this principle in mind, we briefly set out the facts relevant to Johnson's appeal as found by the Iowa Supreme Court. These facts are "fairly supported," 28 U.S.C. § 2254(d)(8), by the record, and thus we defer to the findings of the state court. *Sumner*, 455 U.S. at 597, 102 S.Ct. at 1306; *Graham*, 728 F.2d at 1540.

On July 16, 1980, after Johnson's wife reported the unexplained absence of their son to the police, Kevin Johnson was arrested and charged with the abandonment of a dependent person. *Johnson*, 318 N.W.2d at 420. Prior to interviewing Johnson concerning the disappearance of his son, police officers identified themselves and read Johnson his *Miranda* rights from a standard police department form. Johnson himself then read this form and signed a waiver stating that he understood these rights and was willing to waive them and make a statement. *Id.* at 427–28.

Shortly after the officers began questioning Johnson, they were informed that Johnson's lawyer was on the telephone and wished to speak to Johnson. At this point, the officers immediately terminated the interview. As the officers were leaving the room, however, Johnson placed his hand over the telephone receiver and told one of the officers "to get back to him to let him know what he found out." *Id.* at 428.

Over the course of the next few hours, police officials learned from Johnson's wife that the infant child was dead and had been buried in a wooded area behind the Johnson residence. *Id.* After an unsuccessful attempt to locate the child's grave, the police officer who Johnson had requested tell him

about any new developments and the county attorney went to the county jail to speak to Johnson. *Id.* Upon entering the interview room, the police officer told Johnson that they had uncovered some new information about Johnson's son. Before speaking to Johnson, however, the officer advised Johnson that he had the same rights as before and could remain silent if he chose to do so. At that point, Johnson asked whether he should have his lawyer present. While the officer told Johnson that the decision was up to him, the county attorney specifically told Johnson that "it would be in his best interest to have a lawyer there and if it were me, I'd have one there." *Id.* at 428–30.

Despite being made fully aware of his right to have an attorney present, Johnson asked the officer where his wife was. The officer told Johnson that his wife was in the building making a statement and that from her they had learned that the infant was dead and had been buried. Johnson then stated that he would talk about burying the baby but would not discuss how the baby died. *Id.* at 428–29. Over the course of the next hour to hour and a half, Johnson made a number of incriminating statements that were subsequently admitted into evidence at his trial. During this second interview, Johnson at no time requested a lawyer, invoked his right to remain silent, or told the county attorney or the police officer that he had been advised by his lawyer not to discuss the case with anyone. *Id.* at 429, 436.

In his petition for writ of habeas corpus, Johnson contends that the state trial court should have excluded the statements made by him at the second interview and that the court's failure to do so violated his fifth and sixth amendment right to counsel. With respect to Johnson's fifth amendment right, the Iowa Supreme Court found that Johnson had been "adequately informed of his *Miranda* rights and that he voluntarily, knowingly, and intelligently waived [these rights]." *Id.* at 431. The Iowa Supreme Court reached a similar conclusion with respect to Johnson's sixth amendment right. The court concluded that while

Johnson's sixth amendment right to counsel had attached at the time of the second conversation, *id.* at 435, the government had sustained its heavy burden of demonstrating, consistent with the mandate of *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), that Johnson had understood his right to retain counsel and had intentionally relinquished that right. *Johnson*, 318 N.W.2d at 437; *see Brewer*, 430 U.S. at 404, 97 S.Ct. at 1242. The court also found that, although Johnson had received accurate advice concerning his right to remain silent and his right to have a lawyer present, Johnson himself initiated the conversation in an attempt to ascertain what had been discovered. *Johnson*, 318 N.W.2d at 436; *see Edwards v. Arizona*, 451 U.S. 477, 484, 101 S.Ct. 1880, 1884, 68 L.Ed.2d 378 (1981), and *Shea v. Louisiana*, — U.S. —, 105 S.Ct. 1065, 84 L.Ed.2d 38 (1985).

■ Although we believe the conclusions advanced by the Iowa Supreme Court are constitutionally correct and are fully supported by the record, we find it unnecessary to address the merits of Johnson's fifth and sixth amendment claims. Based on our own independent and thorough review of the record as a whole, we conclude that even if it was error to admit the challenged statements, this error was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). We reach this conclusion for two reasons. First, separate and apart from the statements challenged by Johnson, the evidence presented at trial overwhelmingly established Johnson's responsibility for the infant's death. *Harrington v. California*, 395 U.S. 250, 254, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969). This evidence convincingly reveals that from the beginning of his tragically short life, Johnson's infant son was systematically and deliberately subjected to a litany of abuse and torture. *Johnson*, 318 N.W.2d at 437–38. And, while it does appear that Johnson's wife played some role in the abuse, it is also clear that Johnson himself was primarily responsible for and the insti-

gator of this sadistic abuse. The evidence is also uncontradicted that Johnson felt his son was a "creep" and that Johnson "wanted him dead." *See, e.g.,* Trial Transcript at 324. Finally, although defense counsel nobly attempted to discredit Mrs. Johnson's testimony, the evidence shows that on June 29, 1980, Johnson's wish to have his son dead was realized when, with two severe blows, he killed his son by essentially crushing his head.

Second, the statements made by Johnson concerning his son's burial, although certainly relevant, were largely cumulative of his wife's uncontradicted testimony concerning the child's burial. During her testimony, Mrs. Johnson precisely and clearly related the details of her son's burial, including substantial testimony of Johnson's involvement. Defense counsel, while attacking Mrs. Johnson on a number of fronts, made virtually no attempt to discredit or contradict her testimony concerning the burial and Johnson's involvement in it. Given the overwhelming independent evidence of Johnson's guilt and the cumulative nature of the challenged statements, we conclude that any error committed by the trial court in admitting these statements was harmless beyond a reasonable doubt. *Chapman,* 386 U.S. at 24, 87 S.Ct. at 828.

Johnson next argues that the trial court's refusal to grant his motion for a pre-voir dire change of venue denied him of his right to an impartial jury and to a fair trial. Johnson cannot demonstrate that potential jurors were actually prejudiced because he waived jury trial before conducting voir dire. Instead, Johnson contends that the newspaper articles and television reports surrounding his son's death were so prejudicial and inflammatory that prejudice among potential jurors should have been presumed by the trial court. *See Murphy v. Florida,* 421 U.S. 794, 798–99, 95 S.Ct. 2031, 2035, 44 L.Ed.2d 589 (1975).

The trial court, after reviewing the news articles and transcripts of television newscasts, determined that Johnson could receive a fair trial in Pottawattamie County.

The Iowa Supreme Court agreed with the trial court and, after reviewing the same record, found that the publicity was,

> on the whole, objective, factual reporting. The media expressed no view on [Johnson's] guilt or innocence. Nor was the pre-trial coverage inaccurate, misleading, or unfair. Likewise, no editorial denunciations of [Johnson] appeared and no emotional stories regarding [Johnson or his son] were published. Each account constituted an objective description of the basic facts of the incident or of the preliminary proceedings in the case. No attempts were made to inflame the public mind or to sensationalize the event.

318 N.W.2d at 422. The Iowa Supreme Court also found that most of the publicity appeared at the time of Johnson's arrest, and that any adverse effect on the community had dissipated by the time of trial. *Id.* at 422–23. We agree.

As this court has stated previously: "Just because * * * there has been widespread or even adverse publicity is not in itself grounds to grant a change of venue." *United States v. McNally,* 485 F.2d 398, 403 (8th Cir.1973), *cert. denied,* 415 U.S. 978, 94 S.Ct. 1566, 39 L.Ed.2d 874 (1974). Here, the record provides ample support for the conclusion that Johnson failed to demonstrate the extensiveness and hostility required to give rise to a presumption of prejudice. The trial court thus committed no error in denying Johnson's motion for a change of venue before voir dire. *See United States v. Poludniak,* 657 F.2d 948, 955 (8th Cir.1981), *cert. denied,* 455 U.S. 940, 102 S.Ct. 1431, 71 L.Ed.2d 650 (1982).

Johnson also claims that the denial of his motion for a change of venue rendered his subsequent waiver of a jury trial involuntary. Johnson contends that, because he felt an impartial panel could not be drawn in Pottawattamie County, he had no choice but to waive jury trial in order to present his case to an unprejudiced fact finder. Since Johnson failed to establish that pretrial publicity presumptively deprived him of his right to a fair trial, he can

demonstrate no objective basis for his fear of pervasive prejudice. His purely subjective fear of inability to select an impartial jury, manifested by his waiver of a jury trial before even attempting voir dire, does not make his waiver involuntary in the constitutional sense. *Cf. United States v. Helgesen,* 669 F.2d 69, 72 (2d Cir.) (waiver of jury trial not rendered involuntary because of defendant's fear of facing a panel of her peers), *cert. denied,* 456 U.S. 929, 102 S.Ct. 1978, 72 L.Ed.2d 445 (1982). The trial judge made extensive inquiry, both in chambers and in open court, concerning Johnson's understanding of the nature of his right to a jury and the consequences of a waiver. We conclude the waiver was constitutionally valid. *See United States ex rel Williams v. DeRobertis,* 715 F.2d 1174, 1178–79 (7th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 982, 79 L.Ed.2d 219 (1984).

■ Finally, Johnson contends that the media's coverage of the trial itself had other demonstrable, prejudicial effects on his trial. Specifically, Johnson contends that the media's coverage adversely affected his lawyers' performances, adversely affected the trial court's ability to decide the case, and effectively prevented him from testifying in his own defense. In examining these contentions, we are concerned only with claims of prejudice that amount to a violation of due process, *see Chandler v. Florida,* 449 U.S. 560, 582–83, 101 S.Ct. 802, 813–14, 66 L.Ed.2d 740 (1981), and not with technical violations of state procedures for regulating media coverage, *Johnson,* 318 N.W.2d at 425. Bearing this limitation in mind, we reject Johnson's contentions.

■ With respect to Johnson's lawyers, the record indicates that in addition to extensive media coverage, Johnson's lawyers did receive harassing phone calls during Johnson's trial. However, at an evidentiary hearing conducted by the district court, Johnson's lawyers testified that while the extensive media coverage and harassing phone calls may have been somewhat distracting, these factors had little or no impact on their preparation for or conduct of the trial. Further, the trial record reveals that Johnson's lawyers presented a vigorous and competent defense with no hint of tentativeness or intimidation.

Johnson's contention that the trial court was adversely affected by the media is equally without merit. A review of the entire record reveals no evidence which suggests that the trial judge was adversely affected by the media's coverage. At bottom, Johnson failed to present any evidence demonstrating that the "presence of [the media] impaired the ability of the [trial court] to decide the case on only the evidence" before him. *Chandler,* 449 U.S. at 581, 101 S.Ct. at 813.

Finally, we reject Johnson's contention that adverse media coverage prejudicially affected his constitutional right to testify in his own behalf. While Johnson contends that he waived his right to testify "because of the media," he has never indicated what his testimony would have been had he testified. Because of this failure, we are provided with no basis on which to evaluate Johnson's generalized claim of prejudice and decline to do so.

In conclusion, we find no constitutional deficiencies in the Iowa proceedings that resulted in Johnson's conviction and sentence. Accordingly, the district court's denial of his petition for habeas corpus is affirmed.