# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 97-2004

_____

Marion Albert Pruett,                    *
                                         *
        Appellee,                        *
                                         *
    v.                                   *
                                         *
Larry Norris,                            *
                                         *
        Appellant.                       *

_____                              Appeals from the United States
                                         District Court for the
No. 97-2236                              Eastern District of Arkansas.

_____

Marion Albert Pruett,                    *
                                         *
        Appellant,                       *
                                         *
    v.                                   *
                                         *
Larry Norris,                            *
                                         *
        Appellee.                        *

_____

Submitted:  February 11, 1998

Filed: August 7, 1998

_____

Before WOLLMAN and LOKEN, Circuit Judges, and BOGUE,[1] District Judge.
_____

WOLLMAN, Circuit Judge.

Larry Norris, Director of the Arkansas Department of Correction (the State), appeals from the district court's judgment granting Marion Albert Pruett's petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254. We reverse.

**I.**

In 1979, Pruett was released from a 23-year federal penitentiary sentence for bank robbery, apparently in exchange for his testimony against an underworld figure with whom he was serving time. Pruett was placed in the Federal Witness Protection Program in New Mexico, where he lived under an assumed identity with his wife, Pamela Sue Carnuteson. In April of 1981, Carnuteson was found murdered, her body beaten with a hammer and burned with gasoline. Before authorities could gather enough evidence against him, Pruett fled and embarked on a cross-country spree of armed robberies, abductions, and murder. Among Pruett's more brutal offenses were the murder of Peggy Lowe, a savings and loan officer whom he abducted during a robbery in Jackson, Mississippi, and later shot in the back of the head, and the murders of James R. Balderson and Anthony Taitt, two store clerks whom he shot during separate robberies on the same day in two Colorado cities.[2]

_____

[1]The HONORABLE ANDREW W. BOGUE, United States District Judge for the District of South Dakota, sitting by designation.

[2]For a summary of Pruett's record of criminal violence, see Perry v. Norris, 879 F. Supp. 1503, 1538-40 (E.D. Ark. 1995), aff'd, 107 F.3d 665 (8th Cir.), cert. denied, 118 S. Ct. 15 (1997).

On October 11, 1981, Pruett arrived in Fort Smith, Arkansas, and began scouting the city for a place to commit yet another robbery. He looked for a bank or a store, but since it was Sunday and most establishments were closed he decided to park his car in a secluded, wooded area known as Horseshoe Bend. There, he injected himself with cocaine and consumed whiskey for several hours. Sometime after midnight, Pruett drove to a nearby Convenience Corner grocery mart he had observed on his previous trip to town. Through the window, he could see that Bobbie Jean Robertson, the young woman who worked the 11:00 p.m. to 7:00 a.m. shift, was alone. As Pruett recalled during his confession: "I pulled in and was going to get gas and I seen that there was a girl working there by herself and I said well hell, I think I'll just rob her and kill her so that's what I done."

Pruett entered the store armed with a .38 caliber revolver and instructed Ms. Robertson to place the money from the cash register in a paper bag. He told her to get her pocketbook and then ordered her into his car. As he drove to the secluded area where he had earlier parked, Pruett assured Ms. Robertson that if she cooperated she would be released. When they reached Horseshoe Bend, he instructed Ms. Robertson to get out of the car. She began walking away, then turned and asked if she could have her purse. Still in the car, Pruett raised his revolver and fired. The first bullet struck Ms. Robertson on the upper left thigh, fracturing her femur. As Ms. Robertson struggled and tried to run away, she was struck by a bullet in the right shoulder and fell to the ground. Pruett pulled his car around, got out, and walked over to her. He bent down, pressed the muzzle of his revolver against the young woman's left temple, and fired the third and fatal shot. Pruett returned to his car and drove off with the pocketbook and approximately $165.00 from the store. The next day, police discovered Ms. Robertson's body in a thicket of weeds and small brush just a few feet from the dirt road where she had been murdered.

Five days later, Pruett was stopped for speeding in Texas. The officer saw the holster containing Pruett's .38 caliber revolver protruding from beneath the front seat of Pruett's automobile and arrested him.

Pruett was returned to Mississippi, where he was charged in state court with the murder of Peggy Lowe.[3] While awaiting trial in Mississippi, Pruett was interviewed by Detective Larry Hammond of the Fort Smith Police Department, to whom he provided a detailed confession to the murder of Bobbie Jean Robertson. A jury convicted Pruett of Ms. Lowe's murder and he was sentenced to death.[4] Pruett was then remanded to the custody of the United States and sent to Colorado to be tried for the murders of Balderson and Taitt. Pruett pled guilty to those crimes and received consecutive life sentences.

Pruett was returned to Arkansas to face charges in Ms. Robertson's death. He was arraigned on a capital murder charge on June 12, 1982, in the circuit court of Sebastian County and pled not guilty. The public defender was appointed to assist

---

[3]Pruett was charged in federal court with the robbery of a federally insured savings and loan institution and with abducting Ms. Lowe in connection with that incident, in violation of 18 U.S.C. § 2113(a), (d) & (e). Pruett pled guilty and received consecutive sentences of 25 years and life.

[4]Pruett's conviction and sentence were affirmed by the Supreme Court of Mississippi. See Pruett v. Mississippi, 431 So. 2d 1101, 1110 (Miss.) (en banc), cert. denied, 464 U.S. 865 (1983). Pruett's petition for writ of error coram nobis was denied. See Pruett v. Thigpen, 444 So. 2d 819, 828 (Miss. 1984) (en banc). Subsequently, a district court in Mississippi granted Pruett a new trial, holding that the participation of an admittedly biased juror over the objections of both the defendant and the state entitled him to habeas corpus relief. See Pruett v. Thigpen, 665 F. Supp. 1254, 1266 (N.D. Miss.), aff'd, 805 F.2d 1032 (5th Cir. 1986) (table), cert. denied, 481 U.S. 1033 (1987). In February of 1988, Pruett was retried in Mississippi and once again convicted of Ms. Lowe's murder. Because the jury was unable to reach an agreement during the penalty phase of trial, the court imposed a life sentence.

Pruett, who asked to represent himself. After discussions with counsel, the court set trial for August 30, 1982. In late July, the defense filed a motion for a continuance, which the court denied. In early August, the defense filed a motion for change of venue. At a subsequent pre-trial hearing, the defense renewed its motion for continuance. The court again denied the motion, but informed the public defender that it would grant a continuance in all other cases set for trial in which he was involved. Three days later, the court granted the motion for change of venue and transferred the trial to Van Buren in Crawford County, which is adjacent to Sebastian County and in the same judicial district.

On August 30, voir dire began as scheduled. The defense moved to have the jury panel quashed, for continuance, and for a second change of venue. These motions were denied. After voir dire was completed, the defense renewed its motions to quash the jury panel and for a second change of venue. Once again, the motions were denied. On September 9, 1982, after a trial that featured Pruett himself delivering a closing argument in which he admitted to having killed Ms. Robertson, the jury found Pruett guilty of capital murder. At the conclusion of the penalty phase of the trial, the jury sentenced Pruett to death by electrocution. The court entered judgment on the verdict and sentence, and set Pruett's execution for March 10, 1983. Pruett was then remanded to New Mexico to face charges for the murder of his wife.[5] Pruett was then returned to Mississippi and placed in the custody of the Mississippi Department of Correction.

Meanwhile, Pruett's conviction and sentence for Ms. Robertson's murder were affirmed by the Supreme Court of Arkansas. See Pruett v. Arkansas, 669 S.W.2d 186, 191 (Ark.), cert. denied, 469 U.S. 963 (1984). The court denied his subsequent petition for postconviction relief. See Pruett v. Arkansas, 697 S.W.2d 872, 879 (Ark.

---

[5]Pruett was convicted of murdering Carnuteson and sentenced to life imprisonment. See New Mexico v. Pruett, 675 P.2d 418 (N.M. 1984).

1985) (per curiam). In June of 1987, Governor Clinton filed a demand that Pruett be returned to Arkansas to face execution for Robertson's murder. In March of 1988, Pruett was extradited from Mississippi to Arkansas and remanded to the Department of Correction to await execution of sentence. Execution was set for April 7, 1988. The district court granted Pruett a stay of execution on April 4, 1988, pending a ruling on his petition for writ of habeas corpus filed that day pursuant to 28 U.S.C. § 2254.

Following proceedings that extended over a period of some nine years, the district court granted Pruett's habeas petition. See Pruett v. Norris, 959 F. Supp. 1066, 1092 (E.D. Ark. 1997). The court vacated Pruett's conviction and sentence and ordered the State to release him or retry him within 120 days. See id. Although denying fourteen other asserted grounds for relief, as well as a challenge to the constitutionality of Pruett's extradition from Mississippi, the court held that: (1) Pruett had been denied a fair trial because of pretrial publicity, see id. at 1070-81, and (2) the admission of hypnotically refreshed testimony during the penalty phase of his trial violated Pruett's right of confrontation. See id. at 1081-83. The district court denied the State's motion to stay its order granting habeas relief. After the State filed its notice of appeal, we stayed the district court's order pending this appeal.

## II.

When considering a state prisoner's habeas petition to determine whether circumstances mandate postconviction relief, a federal court's review is limited to determining whether the conviction or sentence was obtained in violation of the Constitution, laws, or treaties of the United States. See Crump v. Caspari, 116 F.3d 326, 327 (8th Cir. 1997) (citing Estelle v. McGuire, 502 U.S. 62, 67-68 (1991)); 28 U.S.C. § 2254(a). In making this assessment, we presume state court findings to be correct unless it is apparent that there was some deficiency in the fact-finding process. See Amrine v. Bowersox, 128 F.3d 1222, 1228 (8th Cir. 1997) (en banc); 28 U.S.C.

§ 2254(d) (1994).[6] The presumption of correctness applies to all factual determinations made by state courts of competent jurisdiction, including trial courts and appellate courts. See Sumner v. Mata, 449 U.S. 539, 546 (1981). We review the district court's factual findings for clear error and its legal conclusions de novo. See Hadley v. Groose, 97 F.3d 1131, 1134 (8th Cir. 1996).

The State first challenges the district court's determination that Pruett was denied a fair trial because of pretrial publicity. Specifically, the district court faulted the trial court's refusal to grant Pruett's motion for a second change of venue and its refusal to grant a continuance that presumably would have allowed Pruett to gather additional evidence to support such a motion. See Pruett, 959 F. Supp. at 1077. Additionally, the district court stated that "[t]he trial judge further erred in accepting at face value the belief of the jurors impaneled that they could ignore what they had read in newspapers, seen on television and heard and give Marion Albert Pruett the fair trial that was and is his right." Id. These findings, entered some fifteen years after Pruett's trial, stand in sharp contrast to those of the state trial court. On direct appeal, the Supreme Court of Arkansas, while acknowledging that "publicity was great in Crawford County as well as Sebastian County," Pruett, 669 S.W.2d at 188, concluded that because the trial court correctly determined that Pruett could receive a fair and impartial trial in

---

[6]Although the substantive standard by which federal courts review state court determinations of law under section 2254 was altered by the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104-132, 110 Stat. 1214, 1218-21 (April 24, 1996), the Supreme Court has held that those changes do not apply retroactively to cases pending when the Act was signed into law. See Lindh v. Murphy, 117 S. Ct. 2059, 2068 (1997); Henderson v. Norris, 118 F.3d 1283, 1288 n.2 (8th Cir. 1997), cert. denied, 118 S. Ct. 1081 (1998). Because Pruett's petition was filed long before the date of its enactment, the Act's heightened evidentiary burden on a habeas petitioner's challenge to a state court's factual findings does not apply in this case. See 28 U.S.C. § 2254(e)(1) (1998).

Crawford County, it did not abuse its discretion in denying a second change of venue or in failing to grant a continuance. See id. at 188-89.[7]

## A.

The Due Process Clause of the Fourteenth Amendment guarantees the Sixth Amendment right of jury trial in state criminal prosecutions. See Duncan v. Louisiana, 391 U.S. 145, 149 (1968)). This right includes the right to trial by an impartial jury. See, e.g., Irvin v. Dowd, 366 U.S. 717, 722 (1961).

The Supreme Court has discussed claims of constitutional error resulting from pretrial publicity in a number of post-Irvin cases. See, e.g., Rideau v. Louisiana, 373 U.S. 723 (1963); Estes v. Texas, 381 U.S. 532 (1965); Sheppard v. Maxwell, 384 U.S. 333 (1966); Murphy v. Florida, 421 U.S. 794 (1975); Patton v. Yount, 467 U.S. 1025 (1984); Mu'Min v. Virginia, 500 U.S. 415 (1991). A petitioner may attempt to prove that pretrial publicity was so extensive and corrupting that a reviewing court is required to "presume unfairness of constitutional magnitude." Dobbert v. Florida, 432 U.S. 282, 303 (1977); see also Snell v. Lockhart, 14 F.3d 1289, 1293 (8th Cir. 1994); United States v. Faul, 748 F.2d 1204, 1211 (8th Cir. 1984). A petitioner must satisfy a high threshold of proof in order to prove inherent prejudice. See Dobbert, 432 U.S. at 303 (quoting Murphy, 421 U.S. at 798) (prejudice from pretrial publicity will not be presumed in absence of "trial atmosphere . . . utterly corrupted by press coverage"). We have held that the presumption of inherent prejudice resulting from pretrial publicity is a principle "rarely applicable, being reserved for extreme situations." Snell,

---

[7]When Pruett renewed his argument regarding pretrial publicity in his petition for state postconviction relief, the Supreme Court of Arkansas reiterated: "As we said on appeal, the trial court meticulously tried to select a fair and impartial jury. Petitioner's allegations of juror bias arising from pretrial publicity are not substantiated in this petition and are but a reworking of arguments made at trial and on appeal." Pruett, 697 S.W.2d at 878.

14 F.3d at 1293; see also Perry v. Lockhart, 871 F.2d 1384, 1390-91 (8th Cir. 1989); Clark v. Wood, 823 F.2d 1241, 1244 (8th Cir. 1987); Wood v. Lockhart, 809 F.2d 457, 460 (8th Cir. 1987); Johnson v. Nix, 763 F.2d 344, 347 (8th Cir. 1985). In determining whether a defendant has met the standard of establishing presumed prejudice, "we consider the circumstances preceding his trial." Snell, 14 F.3d at 1294.

"One who is reasonably suspected of [murder] . . . cannot expect to remain anonymous." Dobbert, 432 U.S. at 303; see also Mu'Min, 500 U.S. at 429 ("Any killing that ultimately results in a charge of capital murder will engender considerable media coverage"). An individual's expectations of privacy and media restraint are lessened when he has resolved to invite the very attention and generate the very publicity of which he later complains. While he was awaiting trial in Mississippi for Lowe's murder, Pruett elected to make several statements to newspaper and television reporters in which he implicated himself in various crimes and boldly labeled himself a "mad-dog killer." Not surprisingly, Pruett's pronouncements did not escape the attention of the Arkansas media.

At an evidentiary hearing held in December of 1994, the district court received testimony regarding the publicity surrounding Pruett's 1982 trial. According to the court's findings, the bulk of publicity to which the populations of Sebastian and Crawford Counties were exposed occurred in the weeks immediately following Ms. Robertson's murder, approximately ten months before Pruett's trial. As might be expected, interest in the case was rekindled as the trial drew near. The court found that Pruett's videotaped statement that he was a "mad-dog killer" was played several times by virtually every local television station and numerous radio stations broadcasting in the region, although no time frame is indicated for these references. Pruett, 959 F. Supp. at 1080 n.12. According to an expert witness retained on Pruett's behalf, "It became commonplace to talk about Pruett as a 'self-confessed mad-dog killer.'" Id.

-9-

Pruett's witnesses made no attempt to characterize the impact of the media coverage as particularly inflammatory or prejudicial, but were largely content to simply document the quantum of its existence. See Dobbert, 432 U.S. at 303 (citing Murphy, 421 U.S. at 798) ("extensive knowledge in the community of either the crimes or the putative criminal is not sufficient by itself to render a trial constitutionally unfair"). Moreover, a more balanced portrait of the extent and intensity of pretrial publicity in this case emerges when one reviews the testimony of Pruett's trial attorney:

Q:     Did you form any opinions about how the publicity affected the jury?

A:     Actually, I was disappointed it was not as extensive as I had been afraid it would be. There were people who said, "Yeah, I've heard the phrase 'mad dog' and I remember 'mad dog killer' but I'm not sure this is the same thing." There was evidence of—There were some people who had some substantial information. There were people who had a little bit of recollection as to the phrase 'mad dog killer' or 'mad dog,' because that was a phrase that kept being run through the media.

Q:     Okay.

A:     But it was not as—As I say, I was somewhat disappointed. I wasn't going to let the venue issue die. You know, one of the things that Mr. Pruett and I had talked about when we were talking about the change of venue from Sebastian County to Crawford County was that I didn't intend to just let it die, but if there was anything over in Crawford County, I was going to make a motion for continuance. I was going to ask for the chance to develop the motion for change of venue. And there was enough for me to make that motion, but I—

Q:     But not as much as you would have thought?

A:     Not as much as I really had anticipated.

Q:    Have you handled other death penalty cases where the publicity was more pervasive?

A:    Well, I had two cases where I felt the publicity was more extensive. One was Swindler. That case was a trial on remand from the Arkansas Supreme Court. And we had 120 jurors questioned and 79 excused for cause, so maybe I was spoiled by that case. But Simmons, I thought there would be an extensive— I thought publicity would be horrendous and I thought the jury— I thought the publicity was horrendous and I thought the impact on the jury would be substantial and I was surprised in the voir dire in that case. And that was in the same courtroom. That was in Crawford County in August of 1981. I was surprised that it wasn't as substantial and extensive as I had anticipated.[8]

Nothing suggests that the atmosphere surrounding Pruett's trial was anything other than calm, orderly, and uneventful. The trial had none of the "circus atmosphere" that characterized the trials in Estes and Sheppard. Moreover, the trial was held eleven months after the original crime, long enough for much of any initial shock and hostility in the community to have dissipated. See Simmons v. Lockhart, 814 F.2d 504, 510 (8th Cir. 1987) (recognizing benefits of cooling-off period of seven months). The record indicates that media coverage was largely unexceptional, perhaps even less pervasive and inflammatory than publicity generated in similar cases. Although Pruett's decision to inject his "mad-dog killer" self-assessment into the stream of media may well have had a negative effect upon public opinion, such influences can normally be effectively neutralized by the curative procedural safeguards employed in this case,

---

[8]Defense counsel also gave the following testimony:

Q:    Okay. Did you consider when the venue was changed to Crawford County what the emotional impact would have been on those jurors in Crawford County? . . . Of the crime, the emotional impact of the crime.

A:    I didn't feel that the impact would be nearly as direct. It wasn't in Van Buren. . . . The crime was not committed in Van Buren.

-11-

including a change of venue from the county in which the crime occurred and a thorough, individual voir dire of potential jurors. Accordingly, we conclude that the pretrial publicity in this case fell short of the showing that must be made before prejudice of a constitutional dimension will be presumed. See, e.g., Snell, 14 F.3d at 1293 (pretrial publicity did not prejudice jury despite expert testimony that it was "as great or greater than the publicity in virtually any other trial they had seen"); Orsini v. Wallace, 913 F.2d 474, 482 (8th Cir. 1990) (rejecting argument that pretrial publicity denied petitioner fair trial despite finding that case was "more highly publicized than any other criminal trial in recent Arkansas history").[9]

**B.**

Having concluded that the record does not support a finding of presumed prejudice, we turn to the second tier of analysis, which requires a petitioner to demonstrate actual prejudice as a condition to receiving habeas relief. See Murphy, 421 U.S. at 800; Snell, 14 F.3d at 1294. In making this assessment, a court looks to "indications in the totality of circumstances" to determine if any inference of juror

---

[9]Contrary to the district court's apparent conclusion, this is not a case in which scrutiny of the venire reveals a level of widespread corruption resulting from exposure to pretrial publicity so pervasive and unrelenting as to constitutes inherent prejudice. According to the district court, 22 of the 77 potential jurors (29 percent) acknowledged during voir dire that they likely could not be impartial or accord Pruett a presumption of innocence. See Pruett, 959 F. Supp. at 1075. In our view, such a figure does not evince a "pattern of deep and bitter prejudice" against Pruett that would allow prejudice to be presumed. Snell, 14 F.3d at 1295 (constitutional error resulting from pretrial prejudice could not be presumed where 18 of 49 potential jurors (37 percent) expressed bias against defendant); see also Faul, 748 F.2d at 1213 (affirming denial of relief on similar grounds where 39 of 78 potential jurors (50 percent) were excluded as potentially partial); Murphy, 421 U.S. at 803 (fact that 20 of 78 potential jurors (26 percent) were prejudiced against defendant "by no means suggests a community with sentiment so poisoned against petitioner as to impeach the indifference of jurors who displayed no animus of their own").

partiality rendered the trial fundamentally unfair. Murphy, 421 U.S. at 799. In particular, when a petitioner alleges an improper denial of a motion to change venue, we conduct an independent evaluation of the voir dire testimony of the impaneled jurors. See Hill v. Lockhart, 28 F.3d 832, 847-48 (8th Cir. 1994).

The Constitution does not require jurors to be ignorant of the facts and issues involved in a case. See Irvin, 366 U.S. at 722; Cox v. Norris, 133 F.3d 565, 570 (8th Cir. 1997). Instead, the relevant question is whether the jurors actually seated "had such fixed opinions that they could not judge impartially the guilt of the defendant." Patton, 467 U.S. at 1035; see also Mu'Min, 500 U.S. at 430. "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." Irvin, 366 U.S. at 723; see also Cox, 133 F.3d at 570; Perry, 871 F.2d at 1390.

The question whether a jury was actually impartial is "plainly one of historical fact: did a juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed." Patton, 467 U.S. at 1036. Because a determination of this kind "is essentially one of credibility, and therefore largely one of demeanor," the trial court's resolution of the question is entitled to special deference, id. at 1038, and may be overturned only for "manifest error." Id. at 1031-32; see also Hill, 28 F.3d at 847-48.

The first eleven jurors in Pruett's trial were selected from an original panel of 65 residents of Crawford County.[10] Each of these jurors was accepted by the defense; none was challenged for cause or sought to be challenged peremptorily.[11] A

---

[10]In order of selection, these eleven jurors were: Randy E. Rider, Dee Ann Wilcox, Marilyn Richmond, J. C. Hodges, Mary Carter, Deloyd Burr, Therese Picco, Carolyn Hailey, Lee Wright, Maureen LaRue, and Richard Allured.

[11]The final decision to designate each of these individuals as satisfactory to the defense was apparently made by Pruett himself, acting as co-counsel.

supplemental panel of twelve potential jurors was then summoned, and eight members of this panel were examined before a twelfth juror, Girlie Row, was seated. The defense challenged Row for cause, which the court denied. The defense then stated that it likely would have exercised a peremptory challenge against Row had it not already exhausted its allotted twelve. The defense made no motion or request for additional challenges.

On direct appeal, the Supreme Court of Arkansas made the following observations regarding the jury selection process:

> The number of jurors excused for cause by the trial court indicated that much publicity surrounded this case and that the court meticulously tried to select a fair and impartial jury. Of the 12 members who served on the jury only three had prior knowledge of the facts of the case. The court utilized individually sequestered voir dire in the jury selection process. This was another precaution which the trial court used to insure proper selection of a jury. The court went so far as to allow the striking of jurors who were already seated.

Pruett, 669 S.W.2d at 188-89. The district court disagreed with these observations, finding that eleven of the twelve jurors had had prior exposure to the facts of Pruett's case.[12]

---

[12]The district court's analysis omitted two jurors while including two members of the venire (James Hughes and Nellie Shelly) who were excused before selection was completed. See Pruett, 959 F. Supp. 1078-80. Our review of the voir dire proceedings reveals the following: *Rider* reported having read and heard about Ms. Robertson's murder, but did not know the details of any alleged involvement by Pruett. See Tr. Vol. III at 917-18. *Wilcox* "[v]aguely" recalled having heard of the case. Tr. Vol. IV at 1080. *Richmond* had seen television and newspaper reports about the incident and knew that Pruett had been arrested as a suspect. Id. at 1093-96. *Hodges* had not seen any television reports, but had read about the murder and knew that "a man had been—been charged with it and that's all—about all I've heard about it." Id. at 1386-87. *Carter* had heard of the incident and seen Pruett's picture on television. She also recognized the phrase "mad-dog killer," although she did not see Pruett's press

The district court's emphasis on the number of jurors who had been exposed to some measure of information regarding Ms. Robertson's murder or Pruett's arrest begs the point of the proper inquiry to be made. "The accused is not entitled to an ignorant jury, just a fair one." <u>Simmons</u>, 814 F.2d at 510. Here, each juror expressly affirmed that he or she could be impartial and render a verdict based solely on the evidence presented at trial, and nothing in the record suggests otherwise. <u>See</u> <u>Perry</u>, 871 F.2d at 1390 ("Perry points to nothing in the record that suggests that the jury was partial, as he is required to do").

---

conference. <u>Id.</u> at 1397-1400. *Burr* said that he had read about the murder and Pruett's arrest and had seen a videotape of his being brought to the courthouse. Tr. Vol. V. at 1530-32. *Picco* stated that she had heard Pruett was accused of the crime. <u>Id.</u> at 1690-91. *Hailey* was familiar with the incident and "how [Pruett] referred to himself, evidently he was upset and he called himself a mad-dog killer, is what I heard." <u>Id.</u> at 1740. The trial court specifically questioned Pruett regarding this juror:

> THE COURT: And having heard all of this, it's still your desire that she sit on the Jury?
>
> MR. PRUETT: Yes, sir, it is.

<u>Id.</u> at 1756. *Wright* had not heard anything about the case. Tr. Vol. VI at 1819. *LaRue* had heard about the crime and had seen Pruett "handcuffed" on television. <u>Id.</u> at 1834-35. *Allured* had seen some television reports, but did not recall any details. He was under the impression that Pruett had been convicted of "some other crimes of violence." <u>Id.</u> at 1973-74. As with Hailey, Pruett himself expressly affirmed his desire that Allured serve on the jury after a colloquy with the court. <u>Id.</u> at 1990-91. Lastly, *Row* indicated she had heard that somebody had been murdered and Pruett's name had been mentioned in connection with the incident. She had seen, however, no television or newspaper reports. Tr. Vol. VIII at 2306.

-15-

We conclude that the record does not support the district court's finding that prejudice from pretrial publicity prevented Pruett from receiving a fair trial. Moreover, nothing in the record leads us to believe that the trial court's factual determination that the jury could be impartial was manifestly erroneous. As a result, we conclude that the refusal to grant a second change of venue and the refusal to postpone the trial in order to allow the defense to gather evidence to support such a motion did not result in constitutional error.

## III.

During the sentencing phase of his trial, the State called two witnesses to testify regarding Pruett's robbery of the Unifirst Federal Savings and Loan Association in Jackson, Mississippi, and the abduction of Peggy Lowe. The State first called Betty Sibley, who was working as a teller when the robbery occurred. Sibley testified, in pertinent part:

Q:  . . . and what were the circumstances of that robbery?

A:  . . . [A] man came in and got all of our attention and said, hey, you know, this is a hold-up. He said if we set off an alarm, he would blow our damn brains out and he looked around and he wanted to know who the manager was and Miss Brown said that she was and he told her that he wanted $100,000.00 out of the vault. She said, we don't have that kind of money in the vault and he said, how much money do you have. She told him $10,000.00 and he said, get that. Then he looked around and he said, and I'm taking her as hostage and he pointed to me and he told me to get my keys to my car.

. . . .

A:  At that point, a customer came in the other side of the building and went to the other teller for them to wait. That left Peggy Lowe and Pruett in the lobby. At that point, he had sent the branch manager to get the

money and he made Miss Lowe move over to the desk and sit on the inside of the desk like she was waiting on him. He was sitting on the outside. Then someone come [sic] to the drive-in window and he motioned for me to go wait on the drive-in window. The branch manager had the money and about that time, he and Mrs. Lowe went to Mrs. Lowe's office and her phone rang and he let her answer her phone and he was making her get her keys to her car and it was her son on the phone wanting to come and have lunch with her. Then, he started walking like they were going out of the office and he had the gun behind Mrs. Lowe's back forcing her -- not forcing her, making her go out of the office. Mrs. Lowe came around behind the counter -- I left that out -- Miss Lowe came around behind the counter and got the money from the branch manager and then put it in a sack that Pruett had given her and then they went out of the office.

Following Sibley's testimony, the State called Sergeant O. T. McAlphin, a Jackson police officer, who testified that Pruett had confessed to shooting Ms. Lowe and had provided information that allowed police to recover her body. McAlphin also testified that Ms. Lowe had died from "a gunshot wound to the back of the head." Lastly, the State introduced documents proving that, as a result of the aforementioned events, Pruett had been convicted on federal charges of armed robbery and kidnapping, pursuant to his guilty plea.

By way of mitigation, the defense called Detective Hammond, who related some minor details regarding his investigation of Ms. Robertson's death, and Dr. Douglas A. Stevens, a clinical psychologist, who testified to his opinion that Pruett was suffering from the combined effects of cocaine and amphetamine psychosis to the point that he was "not clearly in contact with reality" when he killed Ms. Robertson. Pruett chose not to testify on his own behalf.

The jury found that Ms. Robertson's murder was committed under two aggravating circumstances: (1) that Pruett had previously committed another felony

-17-

involving "the use or threat of violence to another person or creating a substantial risk of death or serious physical injury to another person," and (2) that he had committed the murder of Ms. Robertson for pecuniary gain. Although it found that Pruett presented some evidence that his mental capacity was impaired as the result of drug abuse, the jury ultimately concluded that no mitigating circumstances existed at the time of the murder. Agreeing that the aggravating circumstances outweighed beyond a reasonable doubt any mitigating circumstances, the jury unanimously sentenced Pruett to death.

In 1988, Pruett's attorneys learned that in September of 1981, Sibley had undergone hypnosis in connection with the FBI's investigation of the Unifirst robbery. The district court found that the State was unaware of this fact when it called Sibley as a witness at the sentencing phase of Pruett's Arkansas trial. The district court then found that the admission of Sibley's testimony violated Pruett's Sixth and Fourteenth Amendment right to confrontation. See Pruett, 959 F. Supp. at 1081. Concluding that the violation did not constitute harmless error, the court granted Pruett's petition on this ground. See Pruett, 959 F. Supp. at 1082-83.

The admission of hypnotically refreshed testimony does not invariably result in constitutional error. See Boykin v. Leapley, 28 F.3d 788, 793-94 (8th Cir. 1994); White v. Ieyoub, 25 F.3d 245, 247 (5th Cir. 1994) (neither due process nor confrontation clause require *per se* bar to admission of post-hypnotic testimony). A defendant states a Confrontation Clause violation by demonstrating that a reasonable jury might have received a significantly different impression of a witness's testimony or credibility had the defense been permitted the opportunity to pursue its proposed line of questioning. See Harrington v. Iowa, 109 F.3d 1275, 1277 (8th Cir. 1997) (citing Delaware v. Van Arsdall, 475 U.S. 673, 680 (1986)).

Assuming, without deciding, that Sibley's testimony violated Pruett's right of confrontation, we proceed to the issue of whether that error was harmless. See Gee v.

-18-

Groose, 110 F.3d 1346, 1350 (8th Cir. 1997) (Confrontation Clause violations are subject to harmless error inquiry). We review the district court's harmless error analysis de novo. See Orndorff v. Lockhart, 998 F.2d 1426, 1432 (8th Cir. 1993).[13]

In Orndorff, we set forth the following procedure for determining whether a Confrontation Clause violation resulting from hypnotically enhanced testimony was harmless:

> We must first compare the pre- and post-hypnotic statements to determine if any "significant differences" exist. If no significant differences are found, the error is deemed to be harmless. If, however, significant differences do exist, we must determine if the variations nevertheless are harmless. To accomplish that task, we assume that [the witness] had been cross-examined about the hypnosis, and we also assume that the damaging potential of that cross-examination was fully realized. That is, we assume the jury was made aware of any changes in [the witness's] story after the hypnosis, as well as the possibility of "confabulation," "suggestibility," and "memory-hardening" that is associated with hypnosis. After making these assumptions, we must determine if we can still say that the error was harmless beyond a reasonable doubt.

998 F.2d at 1431-32 (internal citation and footnote omitted).

In conducting its *Orndorff* analysis, the district court determined that "significant differences" existed between Sibley's pre- and post-hypnotic statements, pronouncing

---

[13]In most federal habeas actions, a harmless error inquiry consists of assessing "whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.'" Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). When a state court has not conducted its own harmless error analysis on a constitutional issue, however, we apply the *Chapman* standard, requiring the State to prove that the error "was harmless beyond a reasonable doubt." Orndorff, 998 F.2d at 1430 (quoting Chapman v. California, 386 U.S. 18, 24 (1967)).

the latter to have been "more detailed, more embellished." Pruett, 959 F. Supp. at 1082. First, the court was troubled by the fact that in her pre-hypnotic statement Sibley had made no mention to police of the telephone call that Ms. Lowe received from her son during the course of the robbery. The court observed that this added detail "strengthened the prosecutor's portrayal of Pruett as inhumane." Id. at 1083. The court also expressed concern that, prior to being hypnotized, Sibley had apparently made no express reference to Pruett's having held a gun to Ms. Lowe's back during the commission of the robbery. See id. at 1082.

With all due respect to the district court's analysis, we conclude that Sibley's post-hypnotic references to Pruett's use of a gun and to the extraneous detail that Ms. Lowe received a phone call from her son during the robbery do not constitute material or significant differences between her pre- and post-hypnotic statements regarding the manner in which Pruett committed the Unifirst robbery. Ms. Sibley's testimony that Pruett had threatened to "blow our damn brains out," coupled with Sergeant McAlphin's testimony that Ms. Lowe had died as a result of a gunshot wound to the back of her head, established beyond any serious doubt the fact that Pruett had used a gun during the robbery. The post-hypnotic reference to the fact that Pruett had held the gun at Ms. Lowe's back as he took her out of the building pales into insignificance in the light of the overall circumstances of the robbery. (Indeed, it would be a unusual jury that would not assume that, having threatened to blow the employees' brains out, Pruett in all likelihood had brandished the weapon as he took Ms. Lowe from the building.) The post-hypnotic reference to the phone call from Ms. Lowe's son is of even less significance. Accordingly, any error resulting from the post-hypnotic testimony was harmless beyond a reasonable doubt.

## IV.

Pruett cross-appeals from the district court's denial of relief on the ground that the jury was not instructed that the death penalty could not be imposed without a finding that Pruett acted with "reckless indifference to human life." See Tison v. Arizona, 481 U.S. 137, 157 (1987) (holding that reckless disregard for human life is sufficiently culpable mental state to support death penalty in felony murder case). The jury was instructed that Pruett could not be found guilty of capital murder under Arkansas law unless the State proved beyond a reasonable doubt that he "caused the death of Bobbie Robertson under circumstances manifesting an extreme indifference to the value of human life." We agree with the district court that that instruction satisfies the constitutional requirements set forth in Tison and that it required the jury to make the finding necessary to support the imposition of the death penalty.

The cross-appeal is denied. The order granting Pruett's habeas petition is reversed, and the case is remanded for entry of judgment dismissing the petition.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-21-